UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re* | Case No. HT 04-12515 [-jrh] |
| SECOND CHANCE BODY ARMOR, INC., | Chapter 11 |
| Debtor. | (Jointly Administered) |
| THOMAS F. REILLY, as ATTORNEY GENERAL of the Commonwealth of Massachusetts, | |
| Plaintiff, | |
| v. | (Removed from the Suffolk Superior Court; No. 03-5450) |
| SECOND CHANCE BODY ARMOR, INC., TOYOBO AMERICA, INC. and TOYOBO COMPANY, LTD., | C.A. No. _____ |
| Defendant. | |

**APPENDIX OF UNPUBLISHED OPINIONS IN SUPPORT OF DEFENDANTS'
MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

NUTTER, McCLENNEN & FISH, LLP
WORLD TRADE CENTER WEST
155 SEAPORT BLVD
BOSTON, MA 02210

Attorneys for Defendants

# CONTENTS OF APPENDIX OF UNPUBLISHED OPINIONS

**Cases**

Antioch Co. v. Pioneer Photo Albums, Inc., No. C-3-99-270, 2000 WL 988249 (S.D. Ohio Mar. 13, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Butcher v. Gerber Prods. Co., No. 98 CIV. 1819, 1998 WL 437150 (S.D.N.Y. Aug. 3, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Danuloff v. The Color Ctr., No. 93-CV-73478-DT, 1993 WL 738578 (E.D. Mich. Nov. 22, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

HFC Commercial Realty, Inc. v. Levine, No. 90 C 2921, 1990 WL 186082 (N.D. Ill. Nov. 9, 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

International Brotherhood of Locomotive Engineers v. Consolidated Rail Corp., No. 94-CV-74457-DT, 1994 WL 808075 (E.D. Mich. Dec. 30, 1994). . . . . . . . . . . . . . . . . . . . .

Roth v. Bank of the Commonwealth, No. 6-71531, 1978 WL 1133 (E.D. Mich. Dec. 11, 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

1378556.1

Westlaw.

Not Reported in F.Supp.2d
2000 WL 988249 (S.D.Ohio)
(Cite as: 2000 WL 988249 (S.D.Ohio))

Page 1

**C**
Only the Westlaw citation is currently available.

United States District Court, S.D. Ohio, Western
Division.

The ANTIOCH COMPANY, Plaintiff,
v.
PIONEER PHOTO ALBUMS, INC., Defendant.

**No. C-3-99-270.**

March 13, 2000.

RICE

*1 Plaintiff Antioch Company ("Antioch") is in the
business of selling photograph and scrapbook
albums, along with related accessories and supplies,
which it markets under the Creative Memories and
Webway trademarks. [FN1] Defendant Pioneer Photo
Albums, Inc. ("Pioneer"), is also in the business of
selling photograph and scrapbook album supplies.
This litigation, the second such action between the
parties, arises out of the advertising by Defendant
Pioneer of its photo and scrapbook album supplies,
using the mark Creative E-Z Load Memory Book.
[FN2] In the present action, Antioch alleges that
Pioneer breached the settlement agreement between
the parties, which constituted the basis for the
dismissal of the first lawsuit, and has engaged in
trademark infringement, false designation of origin,
unfair competition, and false advertising, under state
and federal law. Pending before the Court is Pioneer's
Motion to Transfer Venue to the Central District of
California, pursuant to 28 U.S.C. § 1404(a) (Doc. #
9). For the reasons assigned, Defendant's Motion is
SUSTAINED.

> FN1. The following facts are taken from
> Plaintiff's Complaint (Doc. # 1).

> FN2. In its first lawsuit, filed on February 9,
> 1998, in this Court (Case No. C-3-98-48),
> Antioch alleged trademark infringement,
> unfair competition, and deceptive trade
> practices, under state and federal law.
> Following a confidential settlement between

the parties, that lawsuit was dismissed, with
prejudice, on September 14, 1998. In
paragraph 26 of its current Complaint (Doc.
# 1), Antioch states that a copy of the
settlement agreement is attached thereto as
Exhibit A, and that it is filed under seal.
Plaintiff has failed to file said document
with the Court.

Section 1404(a) provides that "[f]or the convenience
of parties and witnesses, in the interest of justice, a
district court may transfer any civil action to any
other district or division where it might have been
brought." [FN3] 42 U.S.C. § 1404(a). Although
based on the doctrine of forum non conveniens,
section 1404 was intended to be a revision rather than
a codification of the common law. Norwood v.
Kirkpatrick, 349 U.S. 29 (1955). District courts have
more discretion to transfer under § 1404 than they
had to dismiss on the grounds of forum non
conveniens. Id. at 31-32; Piper Aircraft Co. v. Reyno,
454 U.S. 235, 253 (1981).

> FN3. For purposes of this Motion, Antioch
> concedes that this action might have been
> brought in the Central District of California
> (Doc. # 16, n. 1)

"In ruling on a motion to transfer under § 1404(a), a
district court should consider the private interests of
the parties, including witnesses, as well as other
public interest concerns, such as systemic integrity
and fairness, which come under the rubric of
'interests of justice.' " Moses v. Business Card
Express, Inc., 929 F.2d 1131, 1137 (6th Cir.)(quoting
Stewart Org'n., Inc., v. Ricoh, 487 U.S. 22, 30
(1988)), cert. denied, 502 U.S. 821 (1991). The court
must consider a number of case-specific factors,
including, but not limited to: "(1) the Plaintiff's
choice of forum; (2) the relative ease of access to
proof, including the convenience and proximity of
witnesses and the location of documentary evidence;
(3) the respective court's familiarity with applicable
law; (4) the need for a view of the premises; and (5)
the likelihood of expeditious hearing in the respective
courts." Mead Data Central, Inc. v. West Publishing
Co., 679 F.Supp. 1455 (1987)(Rice, J.); see Midwest
Motor Supply Co., Inc. v. Kimball, 761 F.Supp. 1316,
1318 (S.D.Ohio 1991) (Holschuh, J.)(factors include:
"the nature of the suit; the place of the events
involved; the relative ease of access to sources of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 988249 (S.D.Ohio)
**(Cite as: 2000 WL 988249 (S.D.Ohio))**

proof; the nature and materiality of testimony to be elicited from witnesses who must be transported; the respective courts' familiarity with applicable law and the condition of their dockets; and the residences of the parties."). The burden is on the moving party to establish "a strong showing of inconvenience to warrant upsetting the Plaintiff's choice of forum." *Id.* at 805 (citing *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 843 (9th Cir.1986). The district court should deny the defendant's motion when transfer would merely shift the inconvenience from one party to another. *Id.; see Van Dusen v. Barrack,* 376 U.S. 614, 645-46 (1964) ("Section 1404(a) provides for transfer to a more convenient forum, not a forum likely to prove equally convenient or inconvenient."); 15 Charles A. Wright, et al., Federal Practice & Procedure § 3848 at 385-86.

### 1. *Plaintiff's Choice of Forum*

*\*2* "Despite the fact that the enactment of § 1404(a) may have lessened the weight to be given the Plaintiff's choice of forum, it is still a factor to be considered in determining the balance of convenience." *Mead Data Central,* 679 F.Supp. at 1465; *see Hobson v. Princeton-New York Investors, Inc.,* 799 F.Supp. 802, 804 (S.D.Ohio 1992) (citation omitted)("plaintiff's choice of forum is given great weight."). Plaintiff argues that its choice of forum should be given deference, because its principal place of business is located in Yellow Springs, Ohio. Plaintiff also argues that its choice of forum should be given substantial weight, because this litigation arises out of a settlement agreement between the parties, which was negotiated in the context of the prior lawsuit in this Court. Antioch notes that Pioneer never sought to dismiss or to transfer that prior action.

In response, Sheldon Plutsky, President of Pioneer, submitted an affidavit, stating that Defendant "would rather negotiate fair and reasonable settlements than litigate, particularly in a forum as inconvenient as Ohio. Therefore, Pioneer, solely to avoid the expense and inconvenience of litigation, entered into the Settlement Agreement ... [B]ecause it appears that the matter will have to be litigated, Pioneers asks that the Court transfer this case...." (Plutsky Aff. ¶ 10) Pioneer further argues that the Plaintiff's business division at issue in this litigation is located in Minnesota, not in Yellow Springs, Ohio (Compl.¶ 2).

In the present case, Plaintiff's principal place of business is located in Ohio, thus strengthening the

weight to be given to its choice of forum. However, the fact that the business division at issue is located in Minnesota tempers somewhat the importance of the location of Antioch's principal place of business. The fact that this litigation arises from a previous action before this Court also supports the Plaintiff's choice to litigate in this forum. However, the weight to be given to the fact that this Court was the venue of the prior litigation is also lessened in light of Pioneer's explanation for its failure to seek a change of venue for that litigation, and its eagerness for a quick settlement in that action. Accordingly, the Court concludes that, although the facts brought forth by Defendant do not, by themselves, shift the balance in favor of transferring this litigation to the Central District of California, Plaintiff's choice of forum should be afforded only minimal deference.

### 2. *Convenience and Residence of the Parties*

The parties fervently dispute whether Pioneer will be greatly inconvenienced should it be required to litigate in Ohio. In support of its argument that it would suffer serious hardship, Mr. Plutsky stated, under oath, that Pioneer is a small, privately-owned company with less than 200 employees, that it resides in California, and that it has no offices in Ohio (Plutsky ¶ ¶ 4-5). [FN4], [FN5] He further stated Defendant would effectively shutdown operations if its President, Sheldon Plutsky, and two key employees had to travel to Ohio to litigate. (Plutsky ¶ ¶ 4-8). Specifically, Mr. Plutsky states that he is the most active person involved in day-to-day operations of the company; that he supervises and participates in all aspects of Pioneer's operations, including sales, marketing, product development and finance; and that, "if [he] were absent from Pioneer's Chatsworth [, California,] offices in order to attend a trial in Ohio, Pioneer would effectively shut-down and suffer extreme hardship." (*Id.* ¶ 6) In addition to the effects caused by his absence, Mr. Plutsky states that the absences of Roger Cortight, Regional Sales Manager, and Mat Mateo, Inside Sales Manager, from Pioneer's Chatsworth offices would impair its sales operations and customer relations (*id.* ¶ ¶ 7-8). Pioneer further asserts that, although Antioch resides in Ohio, its business division at the center of this litigation is located in Minnesota (Compl.¶ 2), and therefore, Plaintiff will not be greatly inconvenienced by litigating in California rather than in Ohio, unlike Defendant, which will suffer hardship if forced to litigate in Ohio rather than in California.

FN4. He states, albeit through inadmissible hearsay in ¶ 4 of his Affidavit, that he

Not Reported in F.Supp.2d
2000 WL 988249 (S.D.Ohio)
(Cite as: 2000 WL 988249 (S.D.Ohio))

understands that Plaintiff is a substantially larger company with over 10,000 employees and higher levels of sales and revenue.

> FN5. It appears that Pioneer has maintained an independent sales representative in Ohio for the past ten years. Deposition of Plutsky, pg. 12-13, 57; Kovach Aff. ¶ ¶ 1, 2, attached to Defendant's Reply Memorandum (Doc. # 21).

*3 In response, Antioch attempts to refute Pioneer's argument that it will shut down if Mr. Plutsky were required to testify in Ohio. It cites to the deposition of Mr. Plutsky, taken on September 17, 1999, in which he acknowledges that he traveled to numerous trade shows in 1999, including shows in Chicago, Illinois; Las Vegas, Nevada; Dallas, Texas; New Orleans, Louisiana; and near Los Angeles, California. In his deposition, Mr. Plutsky further stated that he vacationed in Tampa, Florida, for a week (Plutsky Dep. at 39), and that he traveled to Chicago, Illinois, for his son's graduation (id. at 40). Although Mr. Plutsky testified that he tried to attend trade shows on weekends, so that he would not be away from the office (id. at 54), he further stated that while away from his office, he continued to conduct business using his cellular telephone, and that he was in "constant contact" with the company (id. at 46, 51-52). Based on this testimony, Antioch argues that Pioneer would not "shut-down" if Mr. Plutsky were required to travel to Ohio to testify.

The sum of Mr. Plutsky's affidavit and deposition testimony is that he is a vital aspect of Pioneer's business. However, the Court agrees with Plaintiff that Mr. Plutsky's deposition testimony indicates that Pioneer will not shut-down if he were forced to travel to Ohio for short periods of time as a result of this litigation. Rather, that testimony indicates that he is able to (and does) conduct business from remote locations when it is necessary for him to be away from his office, and that it is likely that he could and would do likewise from Ohio. Although Pioneer has provided evidence that it would be inconvenient for its President to travel to Ohio, it has not demonstrated that it would suffer severe hardship.

As to Mr. Cortight and Mr. Mateo, Plaintiff has provided no evidence to refute Mr. Plutsky's statements that Pioneer's business would be seriously impaired if those individuals, *along with Mr. Plutsky,* were absent from Pioneer's Chatsworth offices. [FN6] Accordingly, the undisputed evidence is that Pioneer would suffer severe hardship if Mr. Cortight, Mr.

Mateo, *and* Mr. Plutsky, were absent from that entity's California offices for purposes of this litigation. In addition, Antioch has provided no evidence that it would be inconvenienced if the Court were to transfer this litigation to California, such that the Court could conclude that transferring this action would merely shift the inconvenience from Defendant to Plaintiff. Accordingly, the convenience of the parties factor, based on the evidence that Pioneer would be seriously impaired if Mr. Plutsky, Mr. Cortight, and Mr. Mateo were all absent from Defendant's California offices, favors Defendant.

> FN6. Although Mr. Plutsky testified during his deposition that Mr. Cortight has traveled to trade shows and to work with sales representatives, there is no evidence as to the frequency or length of these trips (Plutsky Dep. at 13).

### 3. Convenience of Witnesses

"There is no question that the 'factors to be considered in ruling upon a forum non conveniens motion should include the availability of compulsory process to obtain the attendance of unwilling witnesses, and the costs of obtaining attendance of willing witnesses'." *Mead Data Central, 679 F.Supp. at 1466* (quoting *AMF, Inc. v. Computer Automation, Inc., 532 F.Supp. 1335, 1341 (S.D.Ohio 1982)*).

*4 Defendant argues that litigating in California would be more convenient, because its three main witnesses, Mr. Plutsky, Mr. Cortight, and Mr. Mateo, are California residents, and are vital to Pioneer's operations (Plutsky Aff. ¶ 6- 8). It further argues that both parties are likely to rely on Pioneer employees, who work and reside in California. Antioch replies that it has not determined which witnesses it will present at trial, but that its corporate headquarters are located in Yellow Springs and that it *might* rely on non witnesses located there. There is no indication by either party that it will rely on the testimony of any non-employee witness . [FN7]

> FN7. The Court notes that, to date, each of the individuals named by the parties as anticipated lay witnesses is an employee of one of the parties (Doc. # 18, Doc. # 22).

Because their anticipated witnesses are employees, both parties have the power to compel those witnesses to testify, regardless of the location of this litigation. *Id.* Thus, it is unlikely that either party's case will be compromised by an inability to produce

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

its witnesses. *Id.* However, while Pioneer has provided evidence that litigation in Ohio would be inconvenient to its likely witnesses, Antioch has no provided no evidence that it is likely to produce witnesses who reside in Ohio, thus indicating that it would be more inconvenient for its witnesses to litigate in California rather than in this Court. Because Plaintiff has provided the Court with no basis to conclude that transferring this litigation to the Central District of California would merely shift the inconvenience of litigating from Pioneer to Antioch, this factor weighs in favor of transferring this litigation to California.

### 4. *Access to Documentary Sources of Proof*

While the location of physical evidence ought to be given more weight in the balancing analysis under § 1404(a), the location of documentary evidence is a minor consideration. *Picker Internat'l, Inc., v. Travelers Indemnity Co., 35 F.Supp.2d 570, 574 (N.D.Ohio 1998).* In arguing that transfer is warranted, Defendant contends that the relevant evidence is located at Pioneer's principal place of business, or is equally accessible regardless of location of the lawsuit. In support of Pioneer's argument, Mr. Plutsky has stated that "all of the documents relative to Pioneer's products, advertising and [on the issue of] damages are located in....California" (Plutsky ¶ 9). Thus, Pioneer has provided evidence that litigating in Ohio is inconvenient, due to the location of its documentary evidence.

Antioch argues that Pioneer's argument should not be given weight, considering that Defendant has not specified the number of documents involved. Plaintiff also states that, while it has not determined what documents it will present at trial (a rather surprising admission, given that it is the party which has filed this lawsuit), it *might* rely on documents located in Ohio. As with the convenience of witnesses factor, Antioch has provided no evidence that any of the documentary evidence that it anticipates using at trial is located at its corporate headquarters in Ohio, thus suggesting that it would be inconvenient for it to litigate in the Southern District of California. Plaintiff has provided the Court with no basis to conclude that litigation of this lawsuit in California would merely shift the inconvenience from Defendant to Antioch. Although the location of documentary evidence is only a minor consideration, this factor weighs in favor of transferring this litigation to California.

### 5. *Familiarity with Applicable Law*

**\*5** Defendant argues that trademark claims are often litigated in California and, therefore, California courts are highly familiar with the applicable law. In response, Plaintiff states that paragraph 12 of the settlement agreement between the parties provides that the "legal relations between the parties shall be governed by and construed in accordance with the laws of the state of Ohio, except where such are governed exclusively by federal law." [FN8] Antioch therefore argues that, because the settlement agreement and its state law claims are governed by Ohio law, this Court is the proper forum in which to litigate.

> FN8. Although Plaintiff has not filed a copy of the settlement agreement, Defendant does not dispute Antioch's quotation of this paragraph in its reply memorandum. Accordingly, the Court will assume that the quotation is accurate.

Where resolution of a diversity case requires application of state law, there is a legitimate interest in allowing the court that is most familiar with the applicable law to resolve the dispute. *Shapiro v. Merrill Lynch & Co., 634 F.Supp. 587, 590 (S.D.Ohio 1986).* However, the mere presence of a choice of law provision is not dispositive of a § 1404 motion. As stated by Judge Holschuh:

"[A]lthough choice of law provisions are relevant to venue, such provisions are not dispositive." The present case, an action for breach of a covenant not to compete, does not appear to present any novel or complex issues under Ohio law. Thus, although this Court is more familiar with Ohio law than the Northern District of Georgia, it does not appear that Ohio contract law is so unique that this fact alone should strongly militate against transfer. *Midwest Motors, 761 F.Supp. at 1318* (citation omitted).

In the present case, Plaintiff has brought trademark violation claims under the Lanham Act, the Ohio Deceptive Trade Practices Act, and common law, in addition to a common law claim for breach of contract based on the breach of the settlement agreement. Although the Central District of California is likely less familiar with Ohio law, that lack of familiarity has little import in light of Plaintiff's claims. Generally, the Ohio Deceptive Trade Practices Act is a codification of common law, *Worthington Foods, Inc. v. Kellogg Co., 732 F.Supp. 1417, 1431 (S.D.Ohio 1990),* and that statute is substantially similar to the Lanham Act. *Yocono's*

Not Reported in F.Supp.2d
2000 WL 988249 (S.D.Ohio)
(Cite as: 2000 WL 988249 (S.D.Ohio))

*Restaurant, Inc. v. Yocono,* 100 Ohio App.3d 11, 17, 651 N.E.2d 1347, 1350-51 (Summit Cty.1994)(Chapter 4125 is substantially similar to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)). Accordingly, courts have stated that cases interpreting the Lanham Act are relevant to analysis of claims under the Ohio Deceptive Practices Act or the common law of trademarks. *Id.; Libbey Glass, Inc. v. Oneida Ltd.,* 61 F.Supp.2d 700, 716 (N.D.Ohio 1999)(analysis of trade dress infringement claim under Ohio Deceptive Trade Practices Act and Lanham Act is the same); *Royal Appliance Mfg. Co. v. Hoover Co., Inc.,* 845 F.Supp. 469, 471, n. 4 (N.D.Ohio 1991)("Ohio's Deceptive Trade Practices Act mirrors the Lanham Act for the most part, and the same analysis is used to determine liability under either act."). Therefore, this Court's greater familiarity with Ohio law has little significance with regard to Plaintiff's trademark claims under Ohio law. Moreover, Plaintiff's breach of contract claim does not appear to raise novel or complex issues under Ohio law. Thus, the Central District of California and this Court are equally able to address each of Plaintiff's claims. Accordingly, the familiarity with applicable law factor strongly favors neither Antioch or Pioneer.

### 6. Location of Events Giving Rise to Claim

*6 Pioneer asserts that this litigation arises out of Antioch's advertising practices and, therefore, the events giving rise to this litigation occurred in California. Although Plaintiff has not responded to this argument, the events giving rise to this litigation occurred in those locations where confusion about the origin of Pioneer's product was likely to occur. *See Overland, Inc. v. Taylor,* 79 F.Supp.2d 809, 811 (E.D.Mich.2000)("For claims of 'passing off' under the Lanham Act, courts have found venue proper under section 1391(b)(2) in districts where confusion about the original of the product is likely to occur because this constitutes the 'events or omissions giving rise to the claim.' "); *Cottman Transmission Sys., Inc. v. Martino,* 36 F.3d 291, 295 (3d Cir.1994)(venue in Lanham Act cases focuses on location where the unauthorized passing off takes place). Defendant has sold the allegedly infringing products in Ohio, by means of an independent sales representative (Doc. # 21, Kovach Aff.). Thus, the events giving rise to this litigation occurred as much in Ohio as in California. This factor, therefore, does not weigh in favor of transfer to the Central District of California.

### 7. Remaining factors

None of the remaining factors (need for a view of the premises, and the likelihood of expeditious hearing in the respective courts) provides a basis for transfer to California. There is no need for a view of premises in the present action, and there is no evidence of that this case would receive a more expeditious hearing in California.

Although the factors discussed above do not reach a unanimous conclusion that transfer is proper, the Court concludes, after a review of those factors, that the balance of convenience weighs in the favor of transfer. Although Plaintiff has selected the Southern District of Ohio as its chosen forum and the events giving rise to this litigation occurred, at least in part, in this state, Defendant has provided evidence that it would be greatly inconvenienced by the absence of three of its key personnel for purposes of litigation. In addition, it has provided evidence that its witnesses and documentary evidence are located in California. In contrast, Plaintiff has not provided the Court with any firm indication as to the location of its witnesses and evidence. Nor has Plaintiff proffered any evidence that litigating in California would present an inconvenience to it, and that transferring this litigation to the Central District of California would merely shift the inconvenience of litigation to it from Pioneer. In addition, although Plaintiff raises claims under Ohio law, the nature of those claims are such that the Court is confident that the Central District of California is equally capable of addressing them. In sum, Defendant has established a strong showing of inconvenience sufficient to upset Plaintiff's choice of forum.

For the foregoing reasons, the Defendant's Motion to Transfer (Doc. # 9), pursuant to 28 U.S.C. § 1404(a), is SUSTAINED.

*7 The captioned cause is hereby ordered transferred to the United States District Court for the Central District of California.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

2000 WL 988249 (S.D.Ohio)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

1998 WL 437150
1998 WL 437150 (S.D.N.Y.)
**(Cite as: 1998 WL 437150 (S.D.N.Y.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Robert A. BUTCHER, Thomas H. Johnson, James
Thomas and Daniel J. Velkovich,
individually and as Class Representatives, Plaintiffs,
v.
GERBER PRODUCTS COMPANY, Defendant.

**No. 98 CIV. 1819(RWS).**

Aug. 3, 1998.

Bernstein Litowitz Berger & Grossman, New York,
By Daniel L. Berger, Esq., Darnley D. Stewart, Esq.,
Of Counsel, Mandel & Resnik, New York, By
Richard M. Resnik, Esq., David M. Monachino, Esq.,
Of Counsel, Meyers Tersigni Feldman & Gray, New
York, By Richard N. Gray, Esq., Anthony L.
Tersigni, Esq., Of Counsel, for Plaintiffs.

Orrick, Herrington & Sutcliffe, New York, By Ira G.
Rosenstein, Esq.,    James H. McQuade, Esq., Of
Counsel, for Defendant.

OPINION

SWEET, D.J.

*1 Defendant Gerber Products Co. ("Gerber") has
moved pursuant to 28 U.S.C. § 1404(a) to transfer
this action to the United States District Court for the
Western District of Michigan on the grounds that the
Western District of Michigan is a significantly more
convenient forum for the parties and witnesses than is
the Southern District of New York, and transfer
would advance the overall interest of justice. For the
reasons set forth below, the motion is granted.

*The Parties*

The Plaintiffs are former employees of Gerber. They
are all forty years of age and older. The four named
Plaintiffs bring this suit on behalf of themselves and a
class of approximately 325 former Gerber employees
whom Gerber discharged by Notice of Termination
dated January 9, 1998.

Plaintiff Robert A. Butcher ("Butcher") is a resident
of Centereach, New York, and was employed as a
National Account Manager for Gerber prior to his
termination. Butcher was 53 years old when he was
terminated and had been employed by Gerber for 33
years.

Plaintiff Thomas H. Johnson ("Johnson") is a
resident of Mesquite, Texas, and was employed as a
National Account Manager for Gerber prior to his
termination. Johnson was 49 years old when he was
terminated and had been employed by Gerber for
more than 27 years.

Plaintiff James H. Thomas ("Thomas") is a resident
of Shreveport, Louisiana, and was employed as a
Senior Sales Representative for Gerber prior to his
termination. Thomas was 47 years old when he was
terminated and had been employed by Gerber for
more than 18 years.

Plaintiff Daniel J. Velkovich ("Velkovich") is a
resident of Allentown, New Jersey, and was
employed as a National Account Manager for Gerber
prior to his termination. Velkovich was 55 years old
when he was terminated and had been employed by
Gerber for more than 34 years.

Gerber, a subsidiary of Novartis, a Swiss-based
company, is a Michigan corporation which maintains
its headquarters in Fremont, Michigan. Gerber
manufactures and distributes baby and infant food
products, licenses and distributes branded apparel for
children, manufactures sundry nursery accessories
and infant care items, and licenses the manufacture of
baby food products internationally.

*Prior Proceedings and Facts*

The prior proceedings and facts of this case have
been set forth in a prior decision, familiarity with
which is assumed. *See Butcher v. Gerber Products
Co., No. 98 Civ. 1819, 1998 WL 289869 (S.D.N.Y.
June 2, 1998).* Those facts and proceedings relevant
to this motion are set forth below.

On February 23, 1998, the named Plaintiffs, Butcher,
Johnson, Thomas, and Velkovich, filed charges with
the Equal Employment Opportunity Commission (the
"EEOC"), alleging that their termination from Gerber
was the result of age discrimination in violation of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. (the "ADEA"). On March 11, 1998, they received their Notices of Right to Sue from the EEOC. On March 13, 1998, the named Plaintiffs filed this class action under the ADEA, seeking declaratory and injunctive relief, compensatory and liquidated damages, attorneys fees and other appropriate legal and equitable relief.

*2 On June 2, 1998, this Court converted Plaintiffs' motion for preliminary injunction to a summary judgment motion and granted summary judgment to Plaintiffs on the issue of whether they had waived their right to assert a claim under the ADEA by signing the Release and Waiver Agreement provided to them by Gerber. See Butcher, 1998 WL 289869.

Gerber maintains that this action arises from its decision to make a fundamental change in the way it does business. In the past, Gerber had sold its products, primarily baby food and baby care products, through the use of a direct sales force of Gerber associates. In January 1998, however, citing the ongoing consolidation of accounts, the increasing role of technology, and the move toward centralized buying decisions which diminished Gerber's opportunity for selling to accounts locally, Gerber announced its decision to convert to the use of independent food and care brokers to sell its products to customers, consisting primarily of grocery store chains and other retailers. This decision resulted in the virtual elimination of Gerber's direct sales force.

The four Plaintiffs, one of whom resides in New York, and the others in Texas, Louisiana, and New Jersey, filed this action on behalf of themselves and as representatives of a purported class of others similarly situated, alleging that by converting to a broker sales force and by amending its severance plan, Gerber violated the ADEA. The decisions to eliminate the sales force and to change its severance plan were made by Gerber in Michigan. All but one of the Gerber executives responsible for the decisions live in Michigan.

Gerber itself is located approximately 45 miles from Grand Rapids in the Western District of Michigan, and most of its executive officers have homes and work in and around Fremont, although Gerber does business throughout the United States. Its sales division is currently organized into four regions: the Western region, headquartered in Anaheim, California, the Eastern region, headquartered in Wayne, Pennsylvania, the Central region, headquartered in Schaumburg, Illinois, and the

Southern region, headquartered in Duluth, Georgia. At the time of the conversion to a broker sales force, there were three sales regions which included the Northern region, headquartered in Grand Rapids, Michigan, the Western region in Anaheim, and the Southern region in Duluth.

Gerber filed its motion to transfer the action to the Western District of Michigan on April 27, 1998. The motion was heard and deemed fully submitted on June 3, 1998.

*Discussion*

Motion To Transfer Venue Under § 1404(a) Is Granted
A. *Legal Standard Under § 1404(a)*

Section 1404(a) provides that:
   For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. 1404(a). This section is a statutory recognition of the common law doctrine of *forum non conveniens* as a facet of venue in the federal courts. *Wilshire Credit Corp. v. Barrett Capital Management Corp.,* 976 F.Supp. 174, 180 (W.D.N.Y.1997). Section 1404(a) strives to prevent waste " 'of time, energy and money" and "to protect litigants, witnesses and the public against unnecessary inconvenience and expense." ' *Wilshire,* 976 F.Supp. at 180 (quoting *Continental Grain Co. v. Barge FBL-585,* 364 U.S. 19, 27, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960)).

*3 " '[M]otions for transfer lie within the broad discretion of the courts and are determined upon notions of convenience and fairness on a case-by-case basis." ' *Linzer v. EMI Blackwood Music Inc.,* 904 F.Supp. 207, 216 (S.D.N.Y.1995) (quoting *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 117 (2d cir.1992) (citing *Stewart Org. Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988))). The burden of demonstrating the desirability of transfer lies with the moving party, and in considering the motion for transfer, a court should not disturb a plaintiff's choice of forum "unless the defendants make a clear and convincing showing that the balance of convenience favors defendants' choice." *Hubbell Inc. v. Pass & Seymour, Inc.,* 883 F.Supp. 955, 962 (S.D.N.Y.1995); *see Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.,* 865 F.2d 513, 521 (2d Cir.1989); *Austin v.*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1998 WL 437150
1998 WL 437150 (S.D.N.Y.)
**(Cite as: 1998 WL 437150 (S.D.N.Y.))**

*International Bhd. of Teamsters-Airline Div. 2747, 739 F.Supp. 206, 208 (S.D.N.Y.1990).*

The defendant moving for transfer must, in essence, demonstrate " 'that transfer is in the best interests of the litigation." ' *Linzer*, 904 F.Supp. at 216 (*quoting Eskofot A/S v. E.I. du Pont de Nemours & Co.*, 872 F.Supp. 81, 95 (S.D.N.Y.1995)); *see also Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir.1978). The movant "must support the transfer application with an affidavit containing detailed factual statements relevant to the factors [to be considered by the court in its transfer decision], including the potential principal witnesses expected to be called and a general statement of the substance of their testimony." *Hernandez v. Graebel Van Lines*, 761 F.Supp. 983, 987 (E.D.N.Y.1991).

The inquiry on a motion to transfer is two-fold. The court must first determine whether the action sought to be transferred is one that "might have been brought" in the transferee court. Second, the court must determine whether, considering the "convenience of parties and witnesses" and the "interest of justice," a transfer is appropriate. *Wilshire*, 976 F.Supp. at 180.

As to the first query, the parties do not dispute that the Western District of Michigan is a district where the action might have originally been brought. Therefore, it is only the second inquiry that requires examination.

In determining whether transfer is warranted "for the convenience of the parties and witnesses [and] in the interest of justice" under § 1404(a), courts generally consider several factors. The factors to be considered in the instant case include (1) the convenience of witnesses, (2) the location of relevant documents and the relative ease of access to sources of proof, (3) the convenience of the parties, (4) the locus of operative facts, (5) the availability of process to compel the attendance of unwilling witnesses, (6) the relative means of the parties, (7) the forum's familiarity with the governing law, (8) the weight accorded the plaintiff's choice of forum, and (9) trial efficiency and the interest of justice, based on the totality of the circumstances. *See Orb Factory, Ltd. v. Design Science Toys, Ltd.*, No. 96 Civ. 9469, 1998 WL 262601 (S.D.N.Y. May 19, 1990) (*citing Wilshire, 976 F.Supp. at 181*); *see Constitution Reinsurance Corp. v. Stonewall Ins. Co.*, 872 F.Supp. 1247, 1250 (S.D.N.Y.1995); *Cento Group, S.p.A. v. OroAmerica, Inc.*, 822 F.Supp. 1058, 1060 (S.D.N.Y.1993).

**B. *The Relevant Factors Applied***

*\*4 Application of the delineated factors reveals that Gerber has met its burden under § 1404(a).*

**1. *Convenience of Witnesses and Parties, Location of Documents, and Ease of Access to Sources of Proof***

"The convenience of parties and witnesses is considered 'the essential criteria under the venue statute,' and 'the most significant factor." ' *Cento Group*, 822 F.Supp. at 1060 (*quoting First City Fed. Sav. Bank v. Registrar*, 677 F.Supp. 236, 237 (S.D.N.Y.1988), and *Nieves v. American Airlines*, 700 F.Supp. 769, 773 (S.D.N.Y.1988), respectively). The convenience of counsel, however, is of relatively little consequence under § 1404(a). *Id.* at 1061. *See also Berry v. New York State Dep't of Correctional Servs.*, 808 F.Supp. 1106, 1110 (S.D.N.Y.1992) (stating that an attorney's "inconvenience is accorded little weight under federal law").

In the instant case, many of the witnesses reside in Michigan. Additionally, Gerber, along with the documents relevant to Gerber's decisions at issue, are located in Michigan. Of the named Plaintiffs, only Butcher is a resident of New York, while Johnson resides in Texas, Thomas in Louisiana, and Velkovich in New Jersey. Based on the allegations in the complaint, Gerber estimates that the potential class members live in 44 different states. All of Plaintiffs' attorneys are located in New York. These factors, on balance, weigh in favor of transferring the action to the Western District of Michigan.

Regarding witnesses, Gerber asserts that five persons currently or formerly employed by Gerber have knowledge of the reasons why Gerber decided to convert from a direct sales force to a broker sales force and who also have knowledge concerning the amendments to the severance package about which the Plaintiffs complain. Of these witnesses who will likely be required to testify, three live in Michigan and two in the neighboring state of Illinois. Afred A. Piergallini ("Piergallini"), Vice Chairman, President and CEO; Kristina Kiley ("Kiley"), Vice President, Human Resources; and David Hoogerwerf, former Senior Vice President and CFO, U.S. Foods all reside in Michigan, and Lee VanSyckle, Senior Vice President, National Sales Manager, U.S. Operations; and the independent consultant engaged by Gerber in connection with the decision to convert to a broker sales force live in Illinois. (*See* Kiley Aff. ¶ 6.) The decisions at issue were made in Michigan. As Gerber

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1998 WL 437150
1998 WL 437150 (S.D.N.Y.)
(Cite as: 1998 WL 437150 (S.D.N.Y.))

points out, the people who made them will be material witnesses.

The complaint itself makes specific reference to Piergallini, Lee VanSyckle, as well as three other current or former Gerber executives, all of whom are located in states other than New York and who are likely to testify: Greg Brown, former Senior Vice President of Sales is, to the best of Gerber's knowledge, located in Ohio; Randy Hinshaw, former Vice President, Region Sales Manager--Northern Region is located in Illinois; and Mark Malone, Vice President, Region Sales Manager--Southern Region is located in Michigan. Additionally, Gerber represents that a majority of its executives with relevant information also reside outside of New York and primarily in Michigan or the Midwest.

*5 Plaintiffs take issue with the affidavit submitted by Kristina Kiley in support of the motion to transfer, claiming that it contains no meaningful description of the substance of the testimony to be given by each witness, and that no affidavit has been submitted from any of the witnesses mentioned by Kiley. In support of their contention, Plaintiffs cite _Doman v. Herman,_ 95 Civ. 0260, 1995 WL 347402, at *2 (S.D.N.Y. June 8, 1995), in which this Court, in denying a motion to transfer, stated that "no submission has been made by the [defendants] specifying what they would testify to, or its relevance. Under these circumstances the materiality of their testimony has not been established as a ground for transfer."

Here, however, Gerber has offered that the witnesses it names are material to the litigation as they have knowledge regarding Gerber's decisions and will testify concerning the reasons for those decisions. Contrary to Plaintiffs' assertion, a detailed affidavit from each potential witness outlining his or her specific testimony is not required. The Kiley Affidavit includes a general statement of the nature of the witnesses' testimony, and that is sufficient. _See e.g., Hernandez,_ 761 F.Supp. at 987.

Plaintiffs further contend that no claim has been made by Gerber that it would be inconvenient for any of Gerber's five witnesses to come to New York for this case. Plaintiffs point to the fact, as stated by Butcher and Velkovich in affidavit, that all of the Gerber officials identified have traveled to New York in the past, utilizing the corporate jets maintained by Gerber for that purpose, and represent that it is apparent that Piergallini and other Gerber personnel come to New York and the New York metropolitan

area on a regular basis for various business reasons. According to Plaintiffs, the convenience of New York cannot be seriously questioned given the relationship of the witnesses to Gerber and the availability of the corporate jets to transport them to New York.

Gerber, however, contends that the testimony regarding Gerber's corporate jets is incorrect. It states that in April 1998, Gerber transferred its rights to its corporate airplanes to Novartis Services, Inc. ("NSI") by agreement, granting NSI sole control over use and access to the jets. Additionally, Gerber's corporate policy prior to the assignment of its rights did not permit individual employees unfettered access to a jet, as the jet was available only to groups of three or more when at least one senior executive was present. Gerber maintains that travel by commercial airlines was the customary means of transportation.

Regardless of the use of a corporate jet, the fact that some Gerber employees occasionally may travel to New York on company business only slightly favors denial of transfer. After all, it is more convenient for the witnesses living in or near Michigan to testify there. As to those residing outside of both Michigan and New York, if testimony is required at trial, they will need to travel whatever the ruling on the instant motion. Of the witnesses referred to, three reside in Illinois and one in Ohio; Michigan is more convenient for these witnesses than is New York.

*6 Plaintiffs have pointed to no material witness, absent Butcher, who lives in New York. This leads to the inquiry concerning convenience of the parties. Gerber is located in Michigan. Plaintiffs highlight that Gerber has an insurance subsidiary in White Plains, New York, and the United States headquarters of Novartis, its parent company, is located in northern New Jersey. The location of Gerber's subsidiary and parent, each of which have nothing to do with the present action, does little to diminish Gerber's assertion that Michigan would provide a more convenient forum.

As noted above, of the four named Plaintiffs in this action, only one resides in New York, and he resides in the area served by the Eastern District of New York. The remaining named Plaintiffs have no connection to New York and would be required to travel there for trial. Members of the purported class reside in 44 states. Plaintiffs are aware that 24 of the 180 former Gerber associates that have contacted Plaintiffs' counsel reside in New York and have opted in to this action. According to Gerber, however, none

has chosen to identify him or herself or opt in formally. Nevertheless, over 85% of the former associates to whom Plaintiffs' counsel have spoken reside outside of New York, deflating the contention that New York is the more convenient forum for this case.

Furthermore, Gerber asserts that for all practical purposes, none of the Plaintiffs will be principal witnesses on the central issue of whether Gerber's decisions violated the ADEA. Thus, their testimony is unnecessary to liability. To the extent depositions are taken of any of the opt-ins, contends Gerber, they will likely be taken in the cities in which those Plaintiffs reside. If this case is tried, any Plaintiffs not residing in New York would be required to travel irrespective of whether the trial is held in Michigan or New York. Gerber observes, and it is undisputed, that the cost of food and lodging in New York is significantly greater than Fremont, Michigan or its environs.

Plaintiffs state that because Velkovich's physical condition would render a transfer to Michigan "particularly prejudicial to him," whereas New York is not an inconvenient forum for Gerber, the reasons for transfer evaporate. Plaintiffs again cite _Doman_ as authority, where this Court took into account that the plaintiff had had a heart attack in its decision to deny transfer, noting that "[d]epositions can be arranged to minimize any inconvenience to the parties." _Doman, 1995 WL 347402, at *2._

Gerber responds that Velkovich has supplied no admissible evidence that he could not participate in this action if the case is transferred to the Western District of Michigan, and instead Plaintiffs rely on hearsay testimony that Velkovich's doctor "informed [him] that travel to Michigan ... would be detrimental to [his] health." (Velkovich Aff. ¶ 3.) There has been no affidavit testimony of any doctor testifying to the medical condition of Velkovich currently or to his prognosis for the future.

*7 Even if Velkovich's health is such that a transfer would present a hardship to him, Plaintiffs' contention that Velkovich's health tips the scale in favor of transfer is not supported by their reliance on _Doman._ Although this Court took the plaintiff's health into account in _Doman_, the motion to transfer that case to California, the defendant's state, was denied because the testimonial proof at trial was likely to be limited to the plaintiff and the defendant (each of whom would be inconvenienced by having to testify in the other's preferred forum), because the

principal records were in New York where the plaintiff resided, and because no operative events giving rise to plaintiff's claim took place in California. _See Doman, 1995 WL 347402, at * 2._ By contrast, in this case, the principal records are located, and the operative facts arose, in Michigan, and the proof required involves testimony from witnesses, many of whom reside in or close to Michigan.

Moreover, Gerber maintains that the materiality of Velkovich's testimony is diminished by the fact that the resolution of this case will turn on Gerber's business decision to use a different means of selling its product, and that it is doubtful that Velkovich or any other Plaintiff or opt-in will be able to shed light on that issue. Given all the factors as stated above and as will be stated below, while Velkovich's health is a factor worthy of consideration, it does not tip the balance against transfer.

Plaintiffs correctly contend that it is easier for Gerber to send its representatives to New York for the purposes of this case than it would be for Plaintiffs to fly to Michigan. Plaintiffs represent that since this Court in _Linzer_ denied transfer on the grounds that one of the defendants "travels frequently to New York, and [the Court found] it ... difficult to believe that travel here for purposes of this action would pose an undue hardship," _Linzer, 904 F.Supp. at 216,_ transfer should be denied here as well. However, the _Linzer_ motion was denied not because of the frequency of travel to New York by one of the defendants, but because the operative facts central to the plaintiff's claim occurred largely in New York, and the core evidentiary material and critical testimonial witnesses were located in New York. _Id. at 216-17._ As noted in _Cento Group,_ on plaintiff's assertion that defendant had more contacts with plaintiff's forum choice of New York than did plaintiff, making New York a convenient forum for defendant, this Court stated that "[w]hile this may be true, the test is to determine which forum is more convenient, not whether the chosen forum is impossibly inconvenient for the defendant." _Cento Group, 822 F.Supp. at 1061._

The location of documents and ease of access to sources of proof weighs in favor of transfer. "This factor is clearly an important consideration in motions to transfer pursuant to 28 U.S.C. § 1404(a) ." _Aquatic Amusement Assoc., Ltd. v. Walt Disney World Co., 734 F.Supp. 54, 58 (N.D.N.Y.1990) (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)); see Linzer, 904_

1998 WL 437150
1998 WL 437150 (S.D.N.Y.)
**(Cite as: 1998 WL 437150 (S.D.N.Y.))**

Page 6

F.Supp. at 217 (noting that "most efficient access to ... documents and witnesses [are] factors that strongly militate in favoring litigating this case in New York").

*8 Whatever records exist concerning the challenged decisions are located in Michigan, where the key decisions were made. Thus, transfer will facilitate access to the relevant documents and records. *See Cento Group, 822 F.Supp. at 1062; Boreal Laser Inc. v. Coherent, Inc., 22 U.S.P.Q.2d 1559 (S.D.N.Y.1992).*

Documents relevant to Gerber's decisions, witnesses who can testify about the decisions, and Gerber itself are all located in Michigan. Indeed, the only significant connection to New York in this case is that all of Plaintiffs' attorneys are located here. Yet this fact has little consequence to the transfer decision. *See Cento Group, 822 F.Supp. at 1061; Berry, 808 F.Supp. at 1110.* It is true that Butcher lives in New York, and Velkovich, in poor health, resides nearby in New Jersey. Nonetheless, on balance, the convenience of the witnesses and parties, and the location of documents favor transferring the action to Michigan.

*2. Locus of Operative Facts*

"Where the operative facts occurred is an obvious factor to consider." *Pall Corp. v. PTI Technologies, Inc., 992 F.Supp. 196, 200 (E.D.N.Y.1998).* Courts routinely transfer cases when the principal events occurred and the principal witnesses are located in another district. *See Viacom Int'l, Inc. v. Melvin Simon Prod., 774 F.Supp. 858, 867 (S.D.N.Y.1991) (citing Computer Horizons Corp. v. Knauer, 483 F.Supp. 1272 (S.D.N.Y.1980)).* This factor also supports the transfer to Michigan.

The principal events instigating this action were the decisions by Gerber to convert from a direct sales force to a broker sales force and to change its severance plan. The decision to outsource was made at Gerber's headquarters in Fremont, Michigan, and it is there that the effects of its implementation occurred. The decision to change Gerber's severance plan likewise was made in Michigan. The meetings in which the decision to convert the sales force was announced in 11 states and the District of Columbia. New York was not among them.

Plaintiffs, pursuant to the affidavit made by Velkovich, contend that on at least one occasion in the latter half of 1997, high-level Gerber officials

came to Manhattan with Piergallini to attend a meeting regarding the planning for the reduction of Gerber's sales force. This, however, has been disputed by Gerber which maintains that Velkovich is incorrect, that his affidavit is not based on personal knowledge, and that no such meeting transpired in New York.

*3. Availability of Process To Compel Attendance of Unwilling Witnesses*

Neither Gerber nor Plaintiffs have identified any witness who would be unwilling to attend the trial of this action absent the compulsion of a subpoena. Because the key witnesses mentioned by Gerber reside in or closer to Michigan, any witness unwilling to appear can be adequately represented through deposition testimony. *See Westwood Ventures, Ltd. v. Forum Fin. Group, No. 97 Civ. 514, 1997 WL 266970, at *5 (S.D.N.Y. May 19, 1997).*

*4. Relative Means of the Parties*

*9 Where disparity exists between the parties, such as an individual plaintiff suing a large corporation, the relative means of the parties may be considered. *Hernandez, 761 F.Supp. at 989; see Pall, 992 F.Supp. at 200* ("The Court may also consider ... whether a disparity between the parties exists with respect to their relative means, such as in the case of an individual plaintiff suing a large corporation").

Granted, Plaintiffs are individuals who are suing a corporation that possesses considerably greater financial assets. However, apart from Velkovich, who has stated that transfer would be detrimental to his health, no showing has been made that litigating this action in Michigan would impose an undue hardship on the Plaintiff class. After all, of the four named Plaintiffs, only Butcher resides in New York, and Velkovich is not far in New Jersey. Yet Johnson and Thomas, from Texas and Louisiana, respectively, would need to travel regardless of a transfer. On balance, this factor does not outweigh the reasons supporting a transfer.

*5. Forum's Familiarity With Governing Law*

It is assumed that the federal courts in both this district and the Western District of Michigan are equally familiar with the legal principles necessary to resolve this case. Accordingly, this factor does not favor either party.

*6. Weight Accorded Plaintiffs' Choice of Forum*

A plaintiff's choice of forum is generally entitled to considerable weight. *See Orb,* 1998 WL 262601, at *7; *Westwood Ventures,* 1997 WL 266970, at *2 (citing *Fontana v. E.A.R.,* 849 F.Supp. 212, 215 (S.D.N.Y.1994)); *Kolko v. Holiday Inns, Inc.,* 672 F.Supp. 713, 715 (S.D.N.Y.1987). Where the factors are equally balanced, the plaintiff is entitled to its choice, and the plaintiff's choice is generally accorded more deference where there is a material connection or significant contact between the forum state and the events allegedly underlying the claim or where the plaintiff is a resident of the forum district. *See Orb,* 1998 WL 262601, at *7; *Levitt v. State of Maryland Deposit Ins. Fund Corp.,* 643 F.Supp. 1485, 1493 (E.D.N.Y.1986); *AMVEST Capital Corp. v. Banco Central, S.A.,* 628 F.Supp. 1258 (1986).

However, the emphasis placed by a court on this choice " 'diminishes where ... the facts giving rise to the litigation bear little material connection to the chosen forum." ' *Westwood Ventures,* 1997 WL 266970, at *2; *see Eichenholtz v. Brennan,* 677 F.Supp. 198, 201 (S.D.N.Y.1988) (stating that "plaintiff's choice of forum is given less weight where, as here, the plaintiff is not a resident of the forum and the cause of action is minimally connected with the forum"); *Kolko,* 672 F.Supp. at 715 (noting that if the balance of several factors strongly favor defendant, plaintiff's choice may be disturbed).

In this case, because the facts giving rise to the case have no material connection to New York, many of the witnesses reside in Michigan, Gerber is located in Michigan, and all the documents relating to Gerber's decisions are located in Michigan, the deference afforded to Plaintiffs' choice of New York is minimized.

*10 Moreover, in class actions little weight is given to the plaintiffs' choice. *See Eichenholtz,* 677 F.Supp. at 202; *Werbowsky v. American Waste Servs.,* No. 91 Civ. 6675, 1992 WL 147924, at *2 (S.D.N.Y. June 15, 1992); *Shulof v. Westinghouse Elec. Corp.,* 402 F.Supp. 1262, 1263 (S.D.N.Y.1975). In *Eichenholtz,* the court observed that "[i]n a class action, the named plaintiff's choice of forum is afforded little weight because in such a case, there will be numerous potential plaintiffs, each possibly able to make a showing that a particular forum is best suited for the adjudication of the class' claim." *Eichenholtz,* 677 F.Supp. at 202 (citing *Koster v. Lumbermens Mut. Casualty Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)).

Plaintiffs maintain that although the Second Circuit indicated that plaintiff's choice is a "less significant consideration in a ... class action than in an individual action" in *Warrick v. General Elec. Co.,* 70 F.3d 736, 741 n. 7 (1995), it nevertheless stated that plaintiff's choice of forum was "entitled to substantial consideration," *id.* at 741, and that denial of transfer would serve the convenience of a disproportionate share of class members residing in plaintiff's chosen forum. *See id.* at 741 n. 7.

*Warrick,* however, differs from the case at bar. By way of background, in *Warrick,* the plaintiff class brought an action against their employer, RCA Corporation ("RCA"), RCA's parent company, General Electric Co. ("GE"), and their defined pension plans, alleging that merger of RCA's Plan into GE's Plan violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1058, 1344(d)(3). *Id.* at 737. In deciding to accord plaintiff's choice of forum substantial weight, the court noted that:

> the putative members are or were all employees of RCA, the RCA Plan has been merged into the GE Plan, and GE's principal place of business is located in [plaintiff's] chosen forum .... It is thus reasonable to assume that a disproportionate share of the putative class members reside in [plaintiff's] chosen forum, and accordingly, that denial of the motion for transfer would serve the convenience of the same disproportionate share.

*Id.* at 741 n. 7. Unlike *Warrick,* factors in favor of placing substantial weight to Plaintiffs' choice of forum are lacking in this case. For example, a "disproportionate" number of the putative class members do not reside in New York.

Furthermore, in relying on *Warrick,* Plaintiffs neglected to mention that denying transfer there would facilitate the testimony of some key witnesses, and the access of documents relevant to the case. As Gerber points out, in *Warrick,* the Second Circuit found that the district court improperly transferred the action by failing to consider the requirements of § 1404(a) concerning the convenience of the parties and witnesses. Instead, it transferred the case because a similar case had previously been dismissed on a motion to dismiss, and the district court believed that judicial economy would be fostered by a transfer to that district, which would quickly dispose of the case, as it had the earlier one. *Id.* at 737, 740-41.

7. *Trial Efficiency and the Interests of Justice*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1998 WL 437150
1998 WL 437150 (S.D.N.Y.)
(Cite as: 1998 WL 437150 (S.D.N.Y.))

*11 Beyond these particular concerns, however, a district court has discretion to transfer an action to where the trial would best be expedient and just. *See Red Bull Assoc. v. Best Western Int'l, Inc.*, 862 F.2d 963, 967 (2d Cir.1988). "The relevant docket conditions of the transferor and transferee court[,] [for example,] are relevant" to the transfer determination. *Eichenholtz*, 677 F.Supp. at 202.

It is undisputed that the total number of filings in the Southern District of New York are nearly six times greater than in the Western District of Michigan, and the median time in months from filing to trial is only 15 months in the Western District of Michigan as opposed to 24 months in this district, making it more likely that a prompt trial will occur in Michigan. *See* 1996 Federal Court Management Statistics at 48, 92. Still, judicial economy, although a relevant consideration, is insufficient on its own to support a transfer motion. *See e.g., Warrick*, 70 F.3d at 740; *Westwood Ventures*, 1997 WL 266970, at *6.

In support of Plaintiffs' suggestion that the interest of justice will not be served if this action is transferred to Michigan, they cite *Red Bull*, where the Second Circuit affirmed the district court's refusal to transfer a civil rights case because of the potential inhibitory effect on the enforcement of civil rights laws resulting from a transfer. However, not only was *Red Bull* not a class action, but the court specifically found that the plaintiff Red Bull would likely be unable or unwilling to pursue the case at all were the motion for transfer granted. *Red Bull*, 862 F.2d at 966. In addition, plaintiffs there had "adduced evidence sufficient to persuade the district court of their role as 'private attorneys general' carrying out important community civil rights imperatives by maintaining [the] litigation." *Id.* There has not been a similar showing here.

Plaintiffs nonetheless maintain that transfer would impede the assertion of their rights because Velkovich would be unable to travel to Michigan and the other class members would be deprived of their "point man," Butcher, who actively monitors this action, attends court proceedings, and reports on the case to the class. Additionally, Plaintiffs assert, their attorneys are all in New York.

As discussed above, Velkovich's health was considered as part of the inquiry as to the convenience of the parties. Moreover, the location of Plaintiffs' attorneys is given little, if any, weight. As to Butcher, the fact that he may wish to attend certain court proceedings that may arise in connection with motions on legal matters does not control the decision on a venue motion. It is not necessary for a plaintiff to attend such motions, the results of which can be adequately reported by counsel. The only issue insofar as convenience is concerned is attendance at trial. The convenience of Butcher is outweighed by the convenience to the majority of Gerber witnesses, Gerber itself, the location of material documents and access of evidence, and the locus of the operative events.

*12 Finally, that this Court has granted summary judgment to Plaintiffs on the issue of waiver does not militate against transfer. Although this Court has devoted a fair amount of time and effort to this case, the litigation, as admitted by Plaintiffs, is at an early stage. A mere four-and-a-half months have passed since the filing of this action on March 13, 1998.

In light of the foregoing analysis and consideration of the totality of circumstances, the balance of factors tips in favor of Gerber.

*Conclusion*

For the reasons set forth above, Gerber's motion to transfer this action to the Western District of Michigan is granted.

It is so ordered.

1998 WL 437150 (S.D.N.Y.)

END OF DOCUMENT

Westlaw.

1993 WL 738578
1993 WL 738578 (E.D.Mich.)
**(Cite as: 1993 WL 738578 (E.D.Mich.))**

Page 1

**C**
Only the Westlaw citation is currently available.

United States District Court, E.D. Michigan.

Craig DANULOFF, Plaintiff,
v.
The COLOR CENTER, a Massachusetts joint
venture, Color Across America, a
Massachusetts joint venture, Thomas Munroe, Inc., a
Massachusetts corporation,
and Scitex America Corp., a Massachusetts
corporation, Defendants.

**No. 93-CV-73478-DT.**

Nov. 22, 1993.

*OPINION*

DUGGAN, District Judge.

*1 This is a diversity action in which plaintiff, Craig Danuloff, has sued defendants, Thomas Munroe Incorporated, ("TMI"), Scitex of America Corporation, ("SAC"), and The Color Center, ("TCC"). [FN1] Currently pending before this Court are several motions submitted on behalf of the various defendants. Defendant TMI filed a motion to transfer pursuant to 28 U.S.C. § 1404(a), or in the alternative, to dismiss. Defendants SAC and TCC also filed a motion to transfer. TCC also filed an motion to dismiss based on lack of personal jurisdiction. This Court has reviewed the briefs and supporting documents submitted by the parties with respect to these motions. The Court also had the benefit of oral argument of counsel in a hearing conducted on November 18, 1993. For the reasons that follow, Defendants' motion to transfer is granted, and the motions to dismiss are denied.

BACKGROUND

This action arises out of a dispute between plaintiff and TMI over plaintiff's employment at TMI and his participation in TMI's second Color Across America (R)) ("Color Across America (R) II") seminar series. [FN2] Plaintiff was hired by TMI as an employee and vice-president to prepare the marketing brochures describing the seminar series for graphic arts professionals, and to manage the seminar series. He also served as a faculty member for the Color Across America (R) II seminars. Plaintiff's employment ended in December 1992, after the brochures for the series had been printed and distributed to several geographical markets.

Plaintiff alleges that subsequent to his separation from TMI, he requested TMI to cease distributing the brochures that identified him as a faculty member of the seminars, and included a reference to his past employment association with TMI. On January 21, 1993, TMI and plaintiff entered into a settlement agreement which allowed TMI to continue using the brochure until a new one could be produced. (White Aff. at ¶ ¶ 36-38 and Exhibit 3). At oral argument, the parties indicated that the litigation between plaintiff and TMI. pending before Massachusetts' Middlesex County Court, has been resolved.

In the action currently before this Court, plaintiff alleges that TMI wrongly distributed Color Across America (R) II brochures "to hundreds of thousand of individuals and entities located throughout the United States" after December 1992. (Complaint ¶ 20). He contends that TMI's actions intentionally and maliciously harmed his national reputation and hampered his efforts to obtain new employment. The scheduled seminars spanned the country. (White Aff. at ¶ 25). Between December 1992 and February 1993, 188,642 copies of the brochure were distributed to 16 different states as well as the District of Columbia. In all, there were 27 seminar locations, including one in Michigan. [FN3] Plaintiff initially filed his five count complaint in Wayne County Circuit Court. On August 18, 1992, the case was properly removed to this Court by defendants.

DISCUSSION

*2 The Court first considers the propriety of a transfer, then addresses the issue of personal jurisdiction over TCC, and TMI's motion to dismiss.

A. MOTION TO TRANSFER
Title 28, U.S.C. 1404(a) provides:
For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1993 WL 738578
1993 WL 738578 (E.D.Mich.)
**(Cite as: 1993 WL 738578 (E.D.Mich.))**

To transfer an action under 28 U.S.C. 1404(a) the following criteria must be met: (1) the action could have been brought in the transferee district court; (2) a transfer serves in the interest of justice; and (3) transfer is in the convenience of the witnesses and parties. _International Show Car Ass'n v. ASCAP, 806 F.Supp. 1308, 1310 (E.D.Mich.1992)._  The court ruling on a 1404(a) motion to transfer considers the following factors:

(1) the convenience of the parties; (2) the convenience of the witnesses; (3) the relative ease of access to sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) the practical problems associated with trying the case most expeditiously and inexpensively; and (7) the interest of justice.

_Id._ at 1310 (citations omitted).  In short, the Court may consider any factor that may make any eventual trial "easy, expeditious, and inexpensive." _Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)._  The Supreme Court held that the showing required under 1404(a) is less stringent than that in a motion under _forum non conveniens. Piper Aircraft Co. v. Reyno, 545 U.S. 235, 253, 102 S.Ct. 252, 264, 70 L.Ed.2d 419 (1989)._ [FN4]

### (1) "Might Have Been Brought"

There is no dispute that this action "might have been brought" in the federal district court in Massachusetts.

### (2) Plaintiff's Choice of Forum

All defendants request a transfer, which the plaintiff vigorously opposes. Plaintiff is a resident of Seattle, Washington.    He neither resides nor conducts business in this forum.  SAC manufactures and sells computer graphics equipment.  It is a Massachusetts corporation which has its principal place of business in Bedford, Massachusetts. [FN5]  TMI is also a Massachusetts graphic arts corporation which specializes in training people in "desktop" publishing and the use of computerized graphics equipment.  Its principal place of business is in Cambridge, Massachusetts.    TCC is a Massachusetts general partnership between SAC and TMI, with offices in Cambridge, Chicago, and Los Angeles.  It conducts hands-on training in "desktop" publishing and the use of computer graphics equipment in its offices. [FN6]  This law suit has only two connections with this district.  First, plaintiff's counsel practices law in

Michigan.    This Court finds that any inconvenience that might enure to either parties' counsel is unpersuasive and does not alter this Court's determination under 28 U.S.C. § 1404. _Hite v. Norwegian Caribbean Lines, 551 F.Supp. 390, 395 (E.D.Mich.1982)._

*3 The second connection is that plaintiff filed his complaint in the Wayne County (Michigan) Circuit Court.  Although it is true that "[u]nless the balance strongly favors the defendant, the plaintiff's choice of forum should rarely be disturbed," _International Show Car, 806 F.Supp. at 1312_, plaintiff, here, did not choose this Court as his forum.  Rather, plaintiff chose Wayne County Circuit Court as his forum; plaintiff's claim came before this Court only after defendants had removed the action. _Hite, 551 F.Supp. at 394-95._

Moreover, it is undisputed that "[c]ourts will not blindly prefer the plaintiff's choice of forum." _Waste Distillation Tech. v. Pan American Res., 775 F.Supp. 759, 764 (D.Del.1991)._  A "movant's burden is easier where the plaintiff has not brought suit on its 'home turf' because the interest in litigating in a convenient forum is reduced." _Id._  It has been stated that:

where a plaintiff chooses to litigate away from its principal place of business, "the quantum of inconvenience to defendant needed to tip the balance strongly in favor of transfer necessarily will be less than in the case where plaintiff's choice of forum is highly convenient to plaintiff."

_Id._ (citations omitted).  In light of the facts set forth above, plaintiff's choice of forum has reduced significance in this analysis.

### (3) Convenience of Parties and Witnesses

The location of relevant witnesses is another important factor to be considered in a transfer application.    The convenience of the witnesses is especially compelling in this case given the nature of the action.  Plaintiff alleges that defendants' defamed him.  Regardless of the controlling law in this case, plaintiff must establish the falsity of the offending statements, and establish how these statements actually caused the complained of damages.  In all likelihood, both parties will rely on documentary evidence.    But to probe the state of mind of the responsible defendants and their employees, plaintiff probably will present viva voice testimony. Defendants have asserted that they will rely upon its responsible officers and employees as part of its defense.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1993 WL 738578
1993 WL 738578 (E.D.Mich.)
(Cite as: 1993 WL 738578 (E.D.Mich.))

Page 3

This Court is satisfied that defendants have met their burden under Section 1404(a) and demonstrated that they will suffer great inconvenience and expense if this case continues in this forum. SAC and TCC state that at least three of SAC's officers and a financial analyst employee will be key witnesses in discovery and at trial, and also that they plan to rely on the testimony elicited from TMI's former and current president. (Thiel Aff. at ¶ 10). All of these witnesses are located in Massachusetts. (Id. & Brief at 8-9). The affidavits presented by SAC and TCC adequately specify the identity, nature, and materiality of the testimony from those witnesses. (Thiel Aff. at ¶ ¶ 10-12 and Brief at pp. 8-12) The principal employees that will provide relevant and necessary testimony on behalf of TMI reside in or around Boston. Four of TMI's six employees are identified as significant witnesses in this matter. (White Aff. ¶ ¶ 48-54a). Defendant TMI specifies both the identity of its witnesses that would be inconvenienced, as well as the nature and significance of their testimony. (Id.) A review of the pleadings leads this Court to conclude that the relevant non-party witnesses in this action will likely be those customers solicited by defendants through the mailings of TMI's Color Across America (R) II brochures, as well as former TMI employees. These witnesses appear to be located across the country. [FN7] It is evident that both parties will likely call non-forum witnesses regardless of where any trial in this case ultimately transpires. The Court finds it significant that plaintiff is claiming damages on a nationwide basis. A change in venue from one major city to another results in little overall inconvenience where the witnesses are dispersed throughout the country.

*4 Plaintiff contends that a great number of his witnesses reside in Michigan, but concedes that other potential witnesses reside outside of this forum as well:

The key non-party witnesses that I intend to call ... are the multitude of Michigan residents who received the false information through Brochures or otherwise and the Michigan residents who attended the February 25, 1993 seminar and training activities and classes in Detroit, Michigan ... Other potential key non-party witnesses presumably reside in numerous other states, including, but not limited to, Washington.

(Danuloff Aff. at ¶ ¶ 41-42). At oral argument, counsel for plaintiff asserted what he believed would be the relevant testimony from the witnesses in

Michigan. Counsel, however, did not assert that he could identity any of these witnesses who actually reviewed the brochures to the extent that they were aware of plaintiff's name in the brochure; and counsel did not even assert that any of such witnesses would offer testimony which would support plaintiff's contention that his reputation was "harmed" by such brochures; or that his efforts to obtain employment were adversely affected. In this Court's opinion, plaintiff's inability to give some assurance to this Court that such witnesses will be able to offer relevant testimony causes this Court to give little, if any, weight to the importance of plaintiff's non-party witnesses as a factor in the Court's decision of whether or not to transfer. International Show Car, 806 F.Supp. at 1311-12.

In contrast, defendants provide the approximate number and identity of potential key non-party witnesses, and the nature of their testimony. These witnesses reside in or around Massachusetts and New Jersey. Defendants contend that theses witnesses would be severely inconvenienced if trial were held in this Court. Accordingly, transferring this case would be at the convenience of at least some number of the witnesses.

Based on a review of the potential party/employee witnesses and non-party witnesses to be called, this factor clearly favors a trial in Massachusetts. Defendants' affidavits have illustrated that if this case should go to trial, a number of defendants' key employees who are prospective witnesses would have to interrupt their normal business activities in order to come to this district and testify. Given the size of defendants' staffs and their budgetary constraints, this could pose a significant disruption to defendants' business operations. This is a factor that weighs in favor of transfer. International Show Car, 806 F.Supp. at 1311-13.

Furthermore, the cost would be great to secure defendants' essential witnesses' attendance at trial in this Court. This Court concludes that defendants have shown that the inconvenience of them remaining in this forum clearly outweighs the inconvenience to plaintiff, should this case be transferred to Massachusetts. [FN8]

*(4) Location of Documents*

*5 Defendants also contend that all the relevant documentary evidence is located in Massachusetts. Although the location of evidence may be a factor in determining whether a case should be transferred, it

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1993 WL 738578
1993 WL 738578 (E.D.Mich.)
(Cite as: 1993 WL 738578 (E.D.Mich.))

Page 4

is not enough simply to assert that transfer is necessary because relevant documents are at the defendants' main office in the proposed transferee district. Rather, defendants need to demonstrate that a large volume of documentary evidence must be transported and that it is not possible to reduce the volume through other discovery techniques. _Richards v. Upjohn Co.,_ 406 F.Supp. 405 (E.D.Mich1976). In this case, defendants have not established the necessity of transporting large volumes of documents nor that the volume cannot somehow be consolidated through other devices.

#### (5) Relative Means of the Parties

The Court may consider the relative means of the parties in cases where a disparity between the parties, such as an individual plaintiff suing a large corporation, exists. _Hernandez v. Graebel Van Lines,_ 761 F.Supp. 983, 989 (E.D.N.Y.1991). In this case, although defendants are small businesses and plaintiff is an individual. This Court is not persuaded that litigating this action in Massachusetts would pose an _undue_ hardship upon the plaintiff. Plaintiffs reliance on _Austin v. International Brotherhood of Teamsters-Airline Div.,_ 739 F.Supp. 206 (S.D.N.Y.1990) is misplaced. In _Austin,_ plaintiff stated in her affidavit that she would be "unable to go to Michigan to pursue the action on account of sever financial strain." _Id._ at 208. The court found that the transferee forum was not proper because the plaintiff would be precluded from pursuing her claim in the alternative forum. _Id._ at 208-09. In reaching this decision, however, the court emphasized that "[t]he basis for this decision is not to be construed broadly. Indeed, if plaintiff were in a more secure financial situation, the outcome would probably be different." _Id._ at 209.

Here, plaintiff simply states that he "will incur the least financial hardship in prosecuting his claims in Michigan." (Brief at 8). Although plaintiff characterizes himself as a "financially strapped individual," he neither suggests nor illustrates that he would be precluded from bringing his suit if this Court granted defendants' motion to transfer. (Brief at 9, Danuloff Aff. at ¶ 40). [FN9] Accordingly, this Court finds that this factor is of little or no significance in the analysis under the facts presented in this case.

#### (6) Forum's Familiarity with Controlling Law

In this Court's view, this factor is of little import to this Court's decision on the present motion to transfer, regardless of the controlling law under which this case is tried. [FN10] The present case, an action alleging a variety of tortious acts, [FN11] does not appear to present any novel or complex issues. Thus, regardless of what state law controls, it does not appear that state tort law is so unique that this fact alone should strongly militate either for or against transfer. _Midwest Motor Supply Co., Inc. v. Kimball,_ 761 F.Supp. 1316, 1319 (S.D.Ohio 1991). "[F]amiliarity with state law does not weigh heavily in consideration of a motion to transfer since federal courts must often undertake the task of applying foreign law...." (Plaintiff's Combined Brief at 16).

#### (7) "In the Interest of Justice"

*6 Balancing all the material circumstances of this case in light of the factors set forth above, this Court finds that in the interest of justice, the action should be transferred to Massachusetts.

An additional ground supports this outcome. TCC is also seeking to dismiss the present action, asserting that this Court lacks personal jurisdiction over it. Fed.R.Civ.P. 12(b)(2). Numerous courts have ruled that the interest of justice is served when a case is transferred from a forum where there is a difficult question of personal jurisdiction to a district in which personal jurisdiction is clearly established. [FN12] _See e.g., Datasouth Computer v. Three Dimensional Tech.,_ 719 F.Supp. 446, 452-53 (W.D.N.C.1989) (providing collection of cases). A change of venue may conserve judicial resources, and serve the interests of the parties as well by avoiding an investment of substantial time, money and effort, eliminating the need for discovery because it will render moot the dispute over minimum contacts.

In the case at bar, there is a serious question whether this court's assertion of personal jurisdiction over TCC meets the requirements of the due process clause of the United States Constitution. Resolution of this issue may require a substantial expenditure of additional resources. On the other hand, a change of venue to the District of Massachusetts will completely moot the issue of personal jurisdiction, because that district is where TCC is incorporated and is certainly subject to the in personam jurisdiction of the federal courts. Moreover, if this Court granted TCC's motion to dismiss, it is conceivable that plaintiff could refile his complaint in an appropriate forum; the parties then would face the prospect of duplicative litigation proceeding in separate forums. This would result in an inefficient duplication of judicial efforts.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1993 WL 738578
1993 WL 738578 (E.D.Mich.)
(Cite as: 1993 WL 738578 (E.D.Mich.))

### B. IN PERSONAM JURISDICTION

For the reasons cited above, this Court grants defendants' motion to transfer without resolving the jurisdictional issue. Therefore, TCC's motion to dismiss for lack of personal jurisdiction is denied, without prejudice.

### C. MOTION TO DISMISS--FORUM NON CONVENIENS

TMI alternatively moves for dismissal based on the doctrine of *forum non conveniens.* In light of this Court's decision on defendants' motion to transfer, this Court declines to reach the merits of the motion to dismiss.

### CONCLUSION

For the aforementioned reasons, defendants' motion to transfer pursuant to 28 U.S.C. § 1404(a) shall be granted, defendant TCC's motion to dismiss shall be denied, and TMI's motion to dismiss shall be denied. Accordingly, this case shall be transferred to the federal district court in Massachusetts. An Order consistent with this Opinion shall issue forthwith.

FN1. Plaintiff has also named Color Across America (R) as a defendant in this action. At oral argument on November 18, 1993, counsel for defendants stated that Color Across America (R) is a Massachusetts registered trademark of TMI. Counsel for plaintiff disagreed. This issue can be resolved at a later date.

FN2. The series consisted of 39 two-day seminars scheduled from December 3, 1992 until May 6, 1993. The brochure contained biographical information on the faculty members. It also contained a brief reference to the Color Center's services. The parties have submitted numerous affidavits indicating that SAC provided equipment for TMI's first Color Across America (R) series, but not for the second series.

FN3. Of the 188,642 copies mailed out, 8,460 were mailed to graphic arts professionals in Michigan. The Michigan seminar was conducted in February 1993, and taught by P. White, the President and CEO of TMI, and N. Goodhue, the former

President of TMI.

FN4. "Although the statute was drafted in accordance with the doctrine of *foreign non conveniens* ... it was intended to be a revision rather than a codification of the common law. District courts were given more discretion to transfer under 1404(a) than they had to dismiss on grounds of *foreign non conveniens....* The statute was designed as a 'federal housekeeping measure,' allowing easy change of venue within a unified federal system." *Id.*

FN5. SAC does not have any offices or facilities in Michigan. Although it has seven SAC employees who work in Michigan, they report to SAC's office in Chicago, and none of them could be called as witnesses to this action.

FN6. SAC provides the equipment and performs the administrative tasks for TCC. TMI develops and conducts the training programs. TCC has no facilities, employees, or agents working on its behalf in Michigan. TCC did not teach or otherwise participate in TMI's Color Across America (R) seminars.

FN7. Over 95% of the brochures were distributed outside of Michigan, and over 95% of the seminars were conducted outside of Michigan. (SAC/CC Brief at 13).

FN8. Although the limitation of this Court's subpoena power, *see* Fed.R.Civ.P. 45(e), is an important consideration, as previously indicated in this Opinion, the Court has not been persuaded that there is any need to present the live testimony of any particular non-party witness, nor has it been shown that a witness would be unwilling to appear. Presumably, TMI's former president would be willing to testify at trial on behalf of defendants. However, this Court does not possess subpoena power over TMI's former president; nor does it possess subpoena power over any customers who defendant might call who are non-residents of Michigan.

FN9. Also cutting against his argument is the fact that he brought suit against defendant-TMI in state court in

1993 WL 738578
1993 WL 738578 (E.D.Mich.)
**(Cite as: 1993 WL 738578 (E.D.Mich.))**

Massachusetts.

FN10. The parties disagree with respect to the application of Michigan's choice of law provisions to these facts.

FN11. Plaintiff's complaint avers two counts of invasion of privacy, tortious interference with business relations, unjust enrichment, and defamation.

FN12. Even if this Court does not have jurisdiction over TCC, it is clear that this Court still has the power to transfer the action to another district pursuant to 28 U.S.C. § 1404(a). *Datasouth,* 719 F.Supp at 449-50; *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962); *Taylor v. Love,* 415 F.2d 1118 (6th Cir.1969) *cert denied,* 397 U.S. 1023 (1970); *Big Baby Co. v. Schecter,* 812 F.Supp. 442, 444 (S.D.N.Y.1993); *Volk Corp. v. Art-Pak Clip Art Serv.,* 432 F.Supp. 1179 (S.D.N.Y.1977).

1993 WL 738578 (E.D.Mich.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
1990 WL 186082 (N.D.Ill.)
(Cite as: 1990 WL 186082 (N.D.Ill.))

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.

HFC COMMERCIAL REALTY, INC., a Delaware
Corporation, Plaintiff,
v.
Jeffrey L. LEVINE and David B. Meltz, Defendants.

No. 90 C 2921.

Nov. 9, 1990.

*MEMORANDUM OPINION AND ORDER*

NORDBERG, District Judge.

**\*1** This is a diversity action in which plaintiff alleges that defendants have failed to fulfill their obligations pursuant to a guaranty agreement between the parties. Before this court are the plaintiff's motion for judgment on the pleadings and the defendants' motion to transfer venue to the Northern District of Georgia pursuant to § 1404(a). For the reasons set forth below, the court grants defendants' motion to transfer. Accordingly, this court does not reach the issue raised by plaintiff's motion, as it is more appropriately addressed by the transferee court.

*STATEMENT OF FACTS*

Defendants, Levine and Meltz, are residents of Georgia and the sole general partners of Commerce Centers Partners Ltd. ("CCP"). In order to develop an office building in Gwinnett County, Georgia, the defendants sought financing from the plaintiff HFC Commercial Realty ("HFCCR"). Upon executing a promissory note dated June 22, 1988, Levine and Meltz, acting as general partners, procured a loan in the amount of $21,515,152 on behalf of CCP. On the same date, the defendants executed, in their individual capacities, a personal and unsecured guaranty, guarantying full performance by the partnership of all obligations to HFCCR up to the amount of $1,000,000. The negotiations for the initial loan agreement took place over the course of several months, primarily in Georgia.

The following year, the defendants, acting as general partners on behalf of the partnership, sought to increase the amount of the loan to $28,000,000. The borrowing was increased to that amount under an Amended and Restated Promissory Note executed by the defendants as general partners on behalf of CCP on March 14, 1989. In conjunction with that amended note, the defendants, in their individual capacity, executed a Modification, Ratification, and Confirmation of the Guaranty Agreement on the same date. On March 29, 1990, the parties executed a Second Modification, Ratification, and Confirmation of the Guaranty Agreement increasing the amount of the guaranty to $1,100,000. The parties negotiated and executed the amended note and the amended guaranties in Chicago.

On April 27, 1990, CCP failed to tender payments to HFCCR as required by the amended note. That same day, the partnership filed a petition in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, pursuant to 11 U.S.C. Chapter 11. In a letter to each defendant dated May 3, 1990, HFCCR gave written notice of the partnership's default and made demand upon the defendants according to the terms of the amended guaranty. The defendants have not paid the money owed HFCCR under the guaranty agreements.

Plaintiff, HFCCR, brought this action to enforce the terms of the guaranty agreement. In their answer, defendants set forth eight affirmative defenses each of which purports to establish that the guaranty agreements are unenforceable as a matter of law. On August 27, 1990, the plaintiff filed a motion for judgment on the pleadings. Defendants filed a motion for transfer of venue on September 20, 1990, on the grounds of *forum non conveniens*.

*DISCUSSION*

**\*2** Defendants' motion to transfer from one federal forum to another is governed by 28 U.S.C. § 1404(a). That section provides: "For the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The rationale underlying § 1404(a) is that of efficiency; it is intended to "save time, energy and money and to spare the parties and the witnesses undue expense and inconvenience."

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
1990 WL 186082 (N.D.Ill.)
**(Cite as: 1990 WL 186082 (N.D.Ill.))**

*Countryman v. Stein, Roe & Farnham,* 681 F.Supp.
479, 481 (N.D.Ill.1987).

A court's analysis of a motion brought pursuant to §
1404(a) begins with a determination of whether the
action could have been brought, in the first instance,
in the proposed transferee forum. A court must then
look to the three factors enunciated in § 1404(a), the
convenience of both the parties and the witnesses and
the interests of justice, giving appropriate weight to
the plaintiff's choice of forum. The burden is on the
moving party--in this case the defendant--to establish
that the transferee forum is clearly more convenient
in light of these factors. *Coffey v. Van Dorn Iron
Works,* 796 F.2d 217, 219-220 (7th Cir.1986).

It is undisputed that this action could have been
brought in the Northern District of Georgia. [FN1]
Therefore, this court will proceed to examine the
motion to transfer in light of the plaintiff's choice of
forum and the three statutory factors. While these
factors define the limits of a court's analysis, that
analysis is shaped by the particular facts of the case.
Because a court must infuse the statutory standards
with a fact-based meaning, the decision on a motion
to transfer is committed to the court's discretion. *Id.*
at 219.

(a) *Plaintiff's Choice of Forum*

Looking first to the plaintiff's choice of forum, while
under the common law doctrine of forum non
conveniens this element was accorded considerable
weight, the enactment of § 1404 decreased its
import. *Norwood v. Kirkpatrick,* 349 U.S. 29, 32
(1955); *Wallen v. Loving,* 609 F.Supp. 159, 161
(N.D.Ill.1985). Under § 1404, it is "not an
overriding consideration, but rather one of many
factors to be considered." *Letter-Rite, Inc. v.
Computer Talk, Inc.* 605 F.Supp. 717, 720
(N.D.Ill.1985), *see also Rockwell International Corp.
v. Eltra Corp.,* 538 F.Supp. 700, 702 (N.D.Ill.1982).

Defendants intimate that the cause of action has little
to do with the forum state, and thus the plaintiff's
choice of forum should be ignored. Memorandum in
Support of Motion to Transfer, p. 4; *see Wallen* at
161. Defendants argue that the property which
engendered both the business relationship between
the parties and the subsequent dispute is located in
Georgia. Furthermore, according to the defendants,
most of the dealings between the parties took place in
Georgia. In their argument, however, the defendants
have chosen to ignore the fact that the plaintiff
corporation has its principal place of business in

Illinois and is an Illinois citizen. Furthermore, while
it may be true that the initial loan agreements and
guaranty were negotiated and executed in Georgia, it
would appear that the loan modification and amended
guaranties were negotiated and executed in Chicago.
It is the subsequent dealings that are the basis for the
plaintiff's claim against defendants, although
defendants claim that the history of the dealings
between the parties is relevant to their affirmative
defenses. This court agrees with plaintiff that, on
balance, the cause of action is more closely related to
Illinois.

*3 Because the cause of action is connected to
Illinois, the plaintiff suggests that this court should
not set aside its choice of forum, as the result would
be a mere shift in the inconvenience from one party
to the other. A transfer of venue is improperly
granted if it merely results in such a shift. *Ameritech
Mobile Communications, Inc v. Cellular
Communications Corp.,* 664 F.Supp. 1175, 1182
(N.D.Ill.1987); *Coffey* at 220. Therefore, unless the
defendants can show that the three statutory factors
"weigh heavily in favor of transfer," the plaintiff's
choice of venue should not be displaced. *Liebovich
Brothers National Sales Corp. v. General Corporate
Consultants, Inc.,* 1990 WL 53217, 1990
U.S.Dist.Lexis 5126, *9 (N.D.Ill.1990).

(b) *Convenience of the Parties*

The first two of the statutory factors, the
convenience of the parties and the convenience of the
witnesses, are concerned with the private interest of
the parties. Consideration of these factors
encompasses "the convenience of calling witnesses
and the court's power to compel their attendance, the
location of documentary evidence, and the financial
costs of trial to the parties involved." *Bertrand
Goldberg Assoc., Inc. v. Providence Hospital,* 1990
WL 43597, 1990 U.S.Dist.Lexis 3892, *11
(N.D.Ill.1990).

Defendants argue that the costs and expenses of
litigating this action in Illinois should be weighed in
favor of their motion to transfer. The defendants
point to the relative financial ability of the parties,
stating that by contrast to plaintiff, a multi-billion
dollar corporation, each defendant has a "relatively
modest net worth." Memorandum in Support of
Motion to Transfer, p. 2. Plaintiff argues in response
that this argument is not compelling as both
defendants were willing enough to travel to Illinois to
negotiate the terms of the modified loan and the
amended guaranty. Thus, according to HFCCR, they

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1990 WL 186082 (N.D.Ill.)
(Cite as: 1990 WL 186082 (N.D.Ill.))

Page 4

¶ ¶ 5-8. Simply because these witnesses were more involved with the initial stages of the relationship does not render their testimony immaterial. In fact, in the situation presented by the defendants in their affirmative defenses as illuminated in their affidavits, Tanski and LoPresti could be expected to have a clear understanding of any significant change in the terms of the relationship instituted by the head office in Illinois.

*5 At this stage, the parties do not have to convince this court that their respective witnesses will prove their cases. Instead they need to demonstrate that an inability to call a witness to the stand could materially hurt them. *Peterson,* 624 F.Supp. at 45. Tanski and LoPresti, while not present at the closing of the loan modification and amended guaranty, appear to have been apprised of the new terms and were involved firsthand in the initial transaction. Because these two witnesses will allegedly enable the defendants to depict an overall view of the relations between the parties, and thus provide support for their affirmative defenses, the defendants' inability to call Tanski and LoPresti may be detrimental to their case.

(d) *Interest of Justice*

The "interest of justice" component of § 1404(a) may determine a motion to transfer even if the other two factors would suggest a different result. *Coffey,* at 220; *see also* 15 C. Wright & A. Miller, *Federal Practice and Procedure,* § 3854 (1986). The considerations that dictate this factor relate to the efficient administration of the courts. Defendants raise three important issues which establish that efficiency interests are weighted in favor of transfer.

Defendants point first to the fact that the guaranty agreement explicitly calls for, and the parties do not contest, the application of Georgia law. The transferee court's familiarity with the applicable law is a consideration relevant to the "interests of justice" prong of § 1404(a). *Coffey* at 221; *see also Van Dusen v. Barrack,* 376 U.S. 612, 645 (1964). While this court has noted in the past that "familiarity with state law does not weigh heavily in consideration of a motion to transfer since a change of venue under § 1404(a) is to be 'but a change in courtrooms,' " *Peterson,* 624 F.Supp. 45, citing *Van Dusen v. Barrack,* 376 U.S. 612, 639 (1964), this court does not believe the consideration to be irrelevant. Rather, as was the case in *Peterson,* when the balance of factors are clearly weighted against transfer, the fact that the transferor court will have to apply

foreign law does not shift the balance in favor of transfer. Thus while not dispositive, the fact that the guaranty is to be construed according to Georgia law weighs in favor of defendant's motion.

Perhaps one of the most important elements involved in a consideration of where a dispute will be most efficiently resolved is the existence of a related action in federal court. In fact, a motion to transfer should be granted, if a related action is pending in the proposed transferee district. *Waites v. First Energy Leasing Corp.,* 605 F.Supp. 219, 223 (N.D.Ill.1985). This rule holds true even if the cases would not be subject to consolidation, if a duplication of discovery efforts will "be avoided by proper judicial coordination." *Id.*

Defendants allege that a related action is pending in the bankruptcy court in the Northern District of Georgia. Clearly a transfer to the Georgia district court would not facilitate a consolidation of the proceedings. Defendants suggest, however, that discovery efforts could be consolidated so as to increase efficiency. More particularly, they allege that a significant number of relevant documents have already been produced in the bankruptcy court.

In *Securities & Exchange Commission v. First National Finance Corp.,* 392 F.Supp. 239, 241 (N.D.Ill.1975), the court granted a motion to transfer that was based in part on the presence of a related action in the bankruptcy court of the transferee district. The court granted the motion in spite of the fact that, as in this case, consolidation of the two cases would have been impossible. The court deemed the transfer efficient, because the parties to each action were identical and the bankruptcy court had jurisdiction over the corporate books and records of the corporate defendants. *Id.*

*6 As in *First National Finance,* substantial discovery relevant to this case has already been produced in Georgia pursuant to the bankruptcy proceedings. 392 F.Supp. at 241. The lack of identity between the parties to the two actions in this case, however, differentiates it from *First National Finance Corp.* While it is the general partners in their personal capacities, rather than the partnership, who are the defendants in this suit, however, the distinction is myopic. The defendants are the sole general partners of the debtor partnership, and as such are integrally related to the bankruptcy proceedings. In *Harbor Universal, Inc. v. Morrow,* 1989 U.S.Dist.Lexis 13243, *6 (N.D.Ill.), the court denied the defendant guarantor's motion to transfer

Not Reported in F.Supp.
1990 WL 186082 (N.D.Ill.)
**(Cite as: 1990 WL 186082 (N.D.Ill.))**

based in part on his comparable relation to the bankruptcy proceedings in the transferor forum.

In support of their motion to transfer, defendants have submitted a copy of the transcript of a hearing on October 31, 1990, before Judge Bihary, who is presiding over the bankruptcy proceedings involving HFC. The hearing involved the defendant's motion to extend the automatic stay under 11 U.S.C. § 105 to enjoin prosecution of this suit on the guaranty. During the course of the hearing, Judge Bihary repeatedly expressed her opinion that by bringing the suit on the guaranty in Illinois, the plaintiff sought to "squeeze" the defendants financially. Defendant's Motion for Leave to File Supplemental Material, Exhibit A, pp. 25, 38 ("Transcript"). Judge Bihary's position was that by pressing the defendants in their personal capacity, the plaintiff threatened to interfere with the fiduciary responsibility of the defendants to come up with a reorganization plan for the partnership:

I think one of the key factors ... in all of these cases is whether the individuals who are not in bankruptcy intend to use their assets to fund, in part, a reorganization plan; such that if their assets are seized through some other mechanism, another lawsuit, the plan is in jeopardy.

Transcript, p. 25; see also p. 85. The judge goes on to discuss the importance of considering all of the transactions between the parties as a whole rather than individually, each in a vacuum. Transcript, p. 43. Finally, while she does not suggest where the claim against the guarantors should have been brought instead--perhaps in deference to this court's impending ruling date on the defendants motion-- Judge Bihary states that "[i]t does look like it belongs, frankly, somewhere other than Chicago." Transcript, p. 85. Giving great weight to Judge Bihary's implication that the bankruptcy and the guaranty could be better resolved if they could be more feasibly coordinated, this court finds the interest of justice prong of § 1404(a) to weigh in favor of transfer.

Finally, the defendants urge this court to compare the docket of this court to that of the proposed transferee forum. Courts in this district have frequently noted a less crowded docket in the transferee forum to be a proper consideration in granting a motion to transfer out of the Northern District of Illinois. *Coffey* at 221; *Karrel,* 699 F.Supp. at 177; *Letter-Rite, Inc.,* 605 F.Supp. at 722. A comparison of the dockets for the Northern District

of Illinois and the Northern District of Georgia reveals that the Illinois courts have a significantly higher average number of weighted case filings. This figure, 603 in Illinois as opposed to 396 in Georgia, reflects the average number of cases adjusted for the length of time consumed by and the difficulty of the cases. "More significant in real-world terms," however, is the fact that the percentage of cases over three years old is 3.0% in Georgia and 9.7% in Illinois. [FN2] *Letter-Rite, Inc.,* 605 F.Supp. at 722. These factors clearly favor transfer to the Northern District of Georgia, where the parties can expect a more expeditious resolution of the dispute.

*CONCLUSION*

While the convenience of the parties and the convenience of the witnesses only marginally favor the defendants, the interests of justice weigh heavily in favor of the defendants' motion to transfer under § 1404(a). Accordingly, this court grants the defendants' motion to transfer and transfers this action to the Northern District of Georgia. Because the court grants the defendants motion, it does not address the plaintiff's motion for judgment on the pleadings, which is more properly brought before the transferee court.

FN1. Diversity of citizenship exists between plaintiff, an Illinois Corporation, and defendants, who are both residents of Georgia. Furthermore, the amount in controversy requirement is met, because the amount in issue is $1.1 million, well above the $50,000 minimum. 28 U.S.C. § 1332. Thus, jurisdiction based on diversity of citizenship is proper in Georgia federal court. Venue is proper in diversity actions in the district where all plaintiffs reside, all defendants reside, or where the claim arose. 28 U.S.C. § 1391(a). Because the defendants are Georgia residents, venue is proper in the Northern District of Georgia.

FN2. The figures used in this discussion were taken from the 1989 Court Management Statistics.

1990 WL 186082 (N.D.Ill.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

1994 WL 808075
1994 WL 808075 (E.D.Mich.)
**(Cite as: 1994 WL 808075 (E.D.Mich.))**

**C**
Only the Westlaw citation is currently available.

United States District Court, E.D. Michigan,
Southern Division.

INTERNATIONAL BROTHERHOOD OF
LOCOMOTIVE ENGINEERS; and General
Committees of
Adjustment for Consolidated Rail Corporation; CSX
Transportation (Northern,
Eastern and Western Lines); Chicago &
Northwestern Transportation; and Norfolk
Southern Transportation (Eastern, Northern and
Southern Lines), Plaintiffs,
v.
CONSOLIDATED RAIL CORPORATION, CSX
Transportation, Inc., Chicago & Northwestern
Transportation Company, and Norfolk Southern
Corporation, Defendants.

**No. 94-CV-74457-DT.**

Dec. 30, 1994.

Stuart M. Israel, Miller, Cohen, Martens, Ice &
Geary, P.C., Southfield, MI, Harold A. Ross, Ross &
Kraushaar Co., Cleveland, OH, for plaintiffs.

Robert C. Ludolph, Pepper, Hamilton & Scheetz,
Detroit, MI, for defendants.

OPINION AND ORDER GRANTING
DEFENDANTS' MOTION TO TRANSFER

ROSEN, District Judge.

I. INTRODUCTION

*1 Pursuant to § § 2 , T hird a nd 6 of t he R ailway
Labor Act ("RLA"), on November 1, 1994, the
Washington, D.C. based National Carriers'
Conference Committee ("NCCC") sent notices to
Plaintiffs (the International Brotherhood of
Locomotive Engineers ("IBLE") and eight IBLE
local unions, known as General Committees of
Adjustment) and other international and local unions
representing employees in the railroad freight
industry. These notices announced that Defendants in
this action (Consolidated Rail Corporation, CSX

Transportation, Inc., Chicago & Northwestern
Transportation Company and Norfolk Southern
Corporation), as well as 25 other rail carriers, had
designated the NCCC as their national bargaining
representative for the current round of collective
bargaining in the railroad freight industry. [FN1]

That same day, Defendants a nd their 25 colleagues
in the industry filed suit in the U.S. District Court for
the District of Columbia against the Brotherhood of
Maintenance of Way Employees ("BMWE"). *See
Alton & Southern Ry. v. BMWE,* No. 94-CV-02365
(Hogan, J.). In that complaint, the rail carriers seek an
order forcing the BMWE, which insisted upon local
rather than national bargaining, to meet with the
NCCC and conduct national bargaining.

On November 3, 1994, Plaintiffs filed the instant suit
against Defendants. The IBLE and its affiliates have
joined the BMWE in demanding local rather than
national bargaining. Plaintiffs' complaint, therefore,
seeks an order requiring Defendants to bargain w ith
them locally. [FN2] Since the filing of the instant
complaint, Plaintiffs have refused to meet in
Washington, D.C. with the NCCC at dates and times
set by that organization.

Defendants filed a motion t o t ransfer t his a ction t o
the D.C. district court on November 7, 1994.
Plaintiffs responded on November 28, and
Defendants replied on December 6. Plaintiffs have
also submitted to the Court a copy of a motion to
transfer the D.C. action to this Court which was filed
by BMWE on December 2. That motion is still
pending before Judge Hogan.

After reviewing the papers filed by the parties and
after hearing oral argument from counsel in a hearing
on December 22, 1994, this Court is prepared to rule
on Defendants' motion to transfer. This memorandum
opinion and order sets forth that ruling.

II. DISCUSSION
A. THE PARTIES' ARGUMENTS.

Defendants argue first in their motion and reply that
venue is proper in the D.C. district. In support of this
contention, they note that their bargaining
representative is based there, that national bargaining
has traditionally occurred there, and that the National
Mediation Board, the federal agency in charge of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1994 WL 808075
1994 WL 808075 (E.D.Mich.)
**(Cite as: 1994 WL 808075 (E.D.Mich.))**

resolving railroad industry labor disputes, is also based there.

Defendants next suggest that venue is not proper in this district. They stress that none of the parties on either side of the caption is based in Detroit, and that Detroit has never been the locus of any railroad bargaining.

*2 Finally, Defendants urge this Court to transfer venue for the sake of judicial economy. For Defendants, the key objective is uniform resolution by a single judge of the local versus national bargaining dispute. Because venue is proper in the D.C. district and because the first action involving the dispute between the parties was filed there, Defendants contend that Judge Hogan should decide this case as well as his own.

Plaintiffs counter Defendants' arguments by suggesting that the D.C. district has fewer contacts with this action than this district. They point out that Plaintiffs have district offices here and no offices in D.C., [FN3] and that many more affected employees reside in this district than in D.C. Similarly, all Defendants have extensive operations in this district, whereas their presence in the D.C. district consists only of limited service provided by two of the named carriers. Finally, Plaintiffs assert that the fact that the D.C. action was filed first should carry no weight. They contend that Defendants have been forum shopping by racing to the courthouse on the first possible day that they could and by choosing a forum with more favorable law despite its limited contacts to the case. Plaintiffs implicitly suggest that the D.C. action should be transferred here when one considers the fact that the union/defendant in that action, the BMWE, is headquartered here in Detroit. If such a transfer occurs, Plaintiffs argue, Detroit clearly becomes the superior situs for a single, national resolution of this dispute.

B. DEFENDANTS' MOTION TO TRANSFER SHOULD BE GRANTED.

1. Venue For This Action Is Proper Both In This District And The D.C. District.

The threshold question which Defendants' motion to transfer presents is whether venue for this action is proper in this district, the D.C. district, or both. This Court believes that venue is proper in both.

29 U.S.C. § § 1391(b) and (c) state the general rule for venue in federal question cases:

(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides if all defendants reside in the same state, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.
(c) For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced....

The parties have not cited, nor is the Court aware of, any statute or other law establishing the venue of RLA cases such as this one. Therefore, the general principles set out above will control the determination of proper venue.

*3 The Court believes that venue is proper for the instant case in this district under the first test of § 1391(b). As pointed out by Plaintiffs, all Defendants have a substantial presence in this district in terms of the rail freight services that they provide. There can be no question, then, that Defendants are subject to personal jurisdiction in this district, and that, therefore, venue is proper here.

Similarly, venue is also proper in the D.C. district, this time under the second prong of § 1391(b). By designating a national bargaining representative located in Washington, D.C., and by insisting that Plaintiffs meet there with this representative, Defendants have forced the issue in this case. Thus, "a substantial part of the events or omissions giving rise to the claim occurred" in the D.C. district, and, as a result, venue is proper there.

2. Defendants' Motion To Transfer Should Be Granted But Without Prejudice To A Determination By The D.C. District Court Of Which Forum Should Ultimately Resolve The National Versus Local Bargaining Dispute.

The Court now turns to the question of which forum is more convenient for this action. Although it is a close question, the Court believes that as things stand now, the D.C. district court is the more convenient forum.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1994 WL 808075
1994 WL 808075 (E.D.Mich.)
(Cite as: 1994 WL 808075 (E.D.Mich.))

Page 3

28 U.S.C. § 1404(a) controls the present inquiry. It states: "For the convenience of parties and witnesses, in the convenience of justice, a district court may transfer any action to any other district or division where it might have been brought."

It is settled law that "[d]istrict courts have wide discretion to transfer an action under 28 U.S.C. § 1404(a) in order to prevent waste of time, energy and money, and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." Helder v. Hitachi Power Tools, USA Ltd., 764 F. Supp. 93, 95-96 (E.D. Mich. 1991). The parties also do not dispute that:

> The factors to be considered by the Court in ruling on a § 1404(a) motion are (1) the convenience of the parties; (2) the convenience of the witnesses; (3) the relative ease of access to sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) the practical problems associated with trying the case most expeditiously and inexpensively; and (7) the interest of justice. Hite v. Norwegian Caribbean Lines, 551 F. Supp. 390, 394 (E.D. Mich. 1982). In short, the Court may consider any factor that may make any eventual trial "easy, expeditious, and inexpensive." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S. Ct. 839, 843 (1947).

Helder, 764 F. Supp. at 96.

Applying these principles to the instant case, the Court believes that venue of this case should be transferred to the D.C. district court. Any inconvenience that Plaintiffs might suffer as a result of this transfer is simply outweighed by the importance of having a single decisionmaker resolve this dispute.

*4 In weighing the convenience factors, the Court is struck by the fact that the issue in this case is a purely legal one -- can the railway freight carriers successfully insist upon national bargaining? Because of the solely legal nature of this case, this Court predicts with some certainty (and the parties essentially concede) that this question can be resolved on the basis of a relatively small documentary record and without the need of an evidentiary hearing, let alone a trial. Neither forum, then, should pose an inconvenience to the parties, especially when one considers that each side is represented by highly competent national as well as local counsel.

To the extent that the convenience to the parties of the comparative forums should be compared, this Court does not agree with Plaintiffs that Detroit has the advantage. None of the parties is based in this district and no national or even local bargaining has taken place here historically. This is in contrast to D.C., which is the home of the employers' representative and the National Mediation Board, [FN4] and is also the traditional site for national bargaining in this industry.

Given that considerations of convenience to the parties do not resolve this motion, what remains is the factor of promoting the ends of justice. The Court notes that the dispute in this case is one of national ramifications. Therefore, it begs for a single, definite ruling lest bargaining come to a halt due to potentially conflicting proceedings and edicts. Because the case before Judge Hogan on the identical issue at the core of this complaint was filed first and remains a live proceeding over which this Court has no control, the D.C. district has the edge over this district as the place for uniform resolution of the national versus local bargaining controversy.

The Court has weighed the merits of Plaintiffs' contention that Defendants' should not enjoy any benefit from filing first because they have engaged in forum shopping. Indeed, the proof of Defendants' forum shopping is very strong. Defendants clearly launched a preemptive strike by filing the D.C. action on the first day in which negotiations could have legally begun. However, it does appear that they had prior notice from BMWE that it would demand local rather than national bargaining. No doubt the BMWE will argue before Judge Hogan that the carriers' hasty filing of the D.C. action constituted a breach of the RLA's good faith bargaining provisions. However, absent a finding of such a good faith violation, this Court cannot hold against Defendants strictly on the basis that they reached to the courthouse first.

The reason for Defendants' race to the D.C. courthouse also seems clear. The D.C. Circuit has held that, in certain circumstances, a party to RLA collective bargaining may be forced to engage in national handling. See Brotherhood of Railroad Trainmen v. Atlantic Coast Line R.R. Co., 383 F.2d 225, 229 (D.C. Cir. 1967), cert. denied, 389 U.S. 1047, 88 S. Ct. 790 (1968). In that case, the D.C. Circuit ruled that the BRT did not violate the RLA by refusing to bargain on a national level with respect to rules regarding the use of conductors and trainmen on yard and road crews. However, it also stated that

*5 The Railway Labor Act does not universally

1994 WL 808075
1994 WL 808075 (E.D.Mich.)
(Cite as: 1994 WL 808075 (E.D.Mich.))

and categorically compel a party to a dispute to accept national handling over its protest. Such bargaining is certainly lawful, however. Whether it is also obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and of the historical experience in handling similar national movements.

383 F.2d at 229. Subsequent decisions by D.C. district courts have applied this test to mandate national bargaining over certain subjects when asked for by one of the parties. See also United Transportation Union v. Burlington Northern, Inc., 325 F. Supp. 1125, 1131 (D.D.C. 1971) (holding that national handling of a fireman manning dispute was obligatory under Atlantic Coast Line test); IAM v. National Ry. Labor Conf., 310 F. Supp. 905, 912 (D.D.C. 1970) (holding that national handling of a wage dispute was obligatory); ap. dismissed as moot, 463 F.2d 872 (D.C. Cir. 1972); Chicago, Burlington & Quincy R.R. v. Railway Employees' Dept., AFL-CIO, 301 F. Supp. 603, 607 (D.D.C. 1969) (holding that "contracting out" work was an obligatory national bargaining subject under the Atlantic Coast Line test).

Plaintiffs, however, are equally culpable of forum shopping in that they have searched for forums which are friendly to its arguments. Both this circuit and the Eighth Circuit, where IBLE and BMWE have filed all of their actions, take a much more favorable view of the unions' position in this round of collective bargaining. In United Transp. Union v. Grand Trunk Western R.R. Co., 901 F.2d 489 (6th Cir.), cert. denied, 498 U.S. 815, 111 S. Ct. 55 (1990), for instance, the Sixth Circuit refused to compel an employer to bargain nationally on health and welfare benefits so long as no national negotiations had already taken place. The Grand Trunk court believed that such a result was inconsistent with § 2, Third of the RLA, 45 U.S.C. § 152, Third, which permits employers and unions to designate bargaining representatives "without interference, influence or coercion" by the other party. The court added that "[n]o court of appeals has compelled national bargaining where a party opted for individual bargaining before the start of negotiations. For us to do so would fly in the teeth of the statute." 901 F.2d at 490. Accord American Ry. & Airway Supervisors Assn. v. Soo Line R.R. Co., 891 F.2d 675, 678 (8th Cir. 1989), cert. denied, 498 U.S. 809, 111 S. Ct. 42 (1990).

The filing of actions in forums that have conflicting

law on the issue of whether a demand for national bargaining may be enforced demonstrates that both sides are shopping for the best possible arena to present their dispute. Because both parties are guilty of forum shopping, this Court cannot accept Plaintiffs' petition to penalize Defendants for engaging in this activity by retaining the case here.

None of Plaintiffs' other arguments in favor of keeping the case here are persuasive. First, their claim that their choice of forum should prevail absent some special showing of inconvenience by the Defendants is rebutted by the fact that being a participant or decisionmaker in multiple, potentially conflicting proceedings on the same legal issue is inconvenient for all concerned. Second, Plaintiffs' arguments about the uniqueness of the instant action are meritless. Although the unions in this case are different than the BMWE in the D.C. action, the legal issue in dispute and the industry affected are identical. Thus, this case is ripe for transfer even though there is not an identity of parties between this action and the D.C. action. Cf. International Show Car Assn. v. ASCAP, 806 F. Supp. 1308, 1313-15 (E.D. Mich. 1992) (transferring venue of antitrust case in part because transferee court still had jurisdiction over antitrust consent degree entered into by defendant and a third party). Moreover, the unique bargaining issues of BMWE and IBLE noted by Plaintiffs are not yet the subject of a dispute with the carriers. Rather, the common issue of whether bargaining on those issues will be national or local is at the core of both cases. [FN5]

*6 In finally deciding this motion, the Court has before it some unattractive choices. It can retain jurisdiction of this case and face the prospect of duplicative and potentially conflicting litigation if the Judge Hogan does not transfer the BMWE case to Detroit. Or it can reward Defendants' "quick-draw" tactics by sending this case to Judge Hogan and, thereby, potentially affect the result of the case. [FN6]

After much consideration, this Court believes that the importance of uniform decisionmaking for the railroad industry's current round of collective bargaining is of paramount importance. Therefore, it orders that this case be transferred to the D.C. district court for consolidation with Judge Hogan's case involving the same issue. See Fed. R. Civ. P. 42(a); D.D.C. Local Rule 405. [FN7]

The Court would like to add an important caveat to this decision. Before Judge Hogan is BMWE's

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1994 WL 808075
1994 WL 808075 (E.D.Mich.)
**(Cite as: 1994 WL 808075 (E.D.Mich.))**

motion to transfer venue, which was also submitted for this Court's consideration of Defendants' motion. Today's opinion and order should not in any way affect Judge Hogan's consideration of BMWE's motion.

The sole reason for transferring venue of the instant action to Judge Hogan is that his case is a live proceeding on the identical issue over which this Court has no control, and the interests of justice demand that a single judge have an opportunity to decide the best approach to managing the issues presented. Should Judge Hogan find that venue is more appropriate here in Detroit for the disputes, then he may transfer as much of the litigation as he deems proper back to this Court.

### III. CONCLUSION
For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's motion to transfer this case to the U.S. District Court for the District of Columbia (Hogan, J.) is GRANTED.

> FN1. Under the current railway labor contract, imposed by an act of Congress, railway freight carriers and unions could not initiate collective bargaining for a new contract or even designate bargaining representatives until November 1, 1994.

> FN2. BMWE has filed another action in this district seeking relief against various railway carriers on the grounds that these carriers have violated the RLA by insisting upon national bargaining. *See BMWE v. Chicago & Northwestern Railway Co.,* No. 94-CV-74758 (November 23, 1994). BMWE has also filed a third analogous action in the U.S. District Court for the Eastern District of Missouri.

> FN3. Plaintiffs, however, all have their main offices in other districts. The IBLE headquarters are in Cleveland, Ohio, and the various General Committees are based in the following cities: Buffalo, New York; Atlantic Beach, Florida; Troy, Alabama; Jacksonville Beach, Florida; Clinton, Iowa; Wheelersburg, Ohio; Clyde, Ohio; and Asheville, North Carolina.

> FN4. Plaintiffs argue that the NCCC and National Mediation Board are not parties to

this action and, thus, their location should have no bearing on the determination of this motion. This Court cannot ignore, however, that the NCCC is already an important player in the events at the center of this dispute, and that the National Mediation Board may become so because of its extensive powers to resolve railway labor disputes.

> FN5. At oral argument on Defendants' motion, Plaintiffs suggested that another reason that Detroit is the superior forum over D.C. is that Plaintiffs would not have been able to file suit against all of the Defendants in the D.C. district court because that court lacked personal jurisdiction over two of the named Defendant-carriers.
> This Court does not believe that it would have been difficult to establish personal jurisdiction over the two carriers in the D.C. district court. First, the carriers have already consented to jurisdiction there by being parties to the suit before Judge Hogan. Second, they have further made themselves vulnerable to personal jurisdiction there by designating the NCCC, a Washington, D.C. organization, as their collective bargaining agent for national handling.

> FN6. The D.C. Circuit has held that while the law of the federal circuit from which a case is transferred "merits close consideration," it "does not have stare decisis effect in a transferee forum ...." *In re Korean Air Lines Disaster of September 1, 1983, 829 F.2d 1171, 1176 (D.C. Cir. 1987).* Thus, it is possible that should Judge Hogan decide both the *BMWE* case now before him and the instant case, he will apply the *Atlantic Coast Lines* rule rather than the *Grand Trunk* rule to this case.

> FN7. This local rule provides that civil cases will be deemed "related" proceedings if "the earliest is still pending on the merits in the District Court and they ... (ii) involve common issues of fact, or (iii) grow out of the same event or transaction ...." The rule goes on to set out a procedure for ensuring that related cases will be assigned to the same judge. This Court believes that the instant case and the matter before Judge Hogan are clearly related cases as defined by Rule 405. Therefore, it is confident that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1994 WL 808075
1994 WL 808075 (E.D.Mich.)
**(Cite as: 1994 WL 808075 (E.D.Mich.))**

      both will end up in front of him

1994 WL 808075 (E.D.Mich.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
1978 WL 1133 (E.D.Mich.), Fed. Sec. L. Rep. P 96,716
(Cite as: 1978 WL 1133 (E.D.Mich.))

Page 1

United States District Court, E.D. Michigan,
Southern Division.

**Roth, et al.**
v.
**Bank of the Commonwealth, et al.**

No. 6-71531

December 11, 1978

PRATT, District Judge.

*1 This is a complex cause of action involving 69 plaintiffs and 19 defendants brought under the Securities Act of 1933, 15 U.S.C. § § 77a-77aa, the Securities Act of 1934, 15 U.S.C. § § 78a-78kk, and the securities laws of various states.

The case arose out of the financing of the Calderone-Curran Ranches. From 1970 to 1973, Calderone-Curran Ranches commenced four separate public offerings of investment contracts involving the purchase and maintenance of herds of polled Hereford cattle. [FN1] Registration statements for each public offering were filed with the Securities Exchange Commission.

> FN1 The dates of the four public offerings were August 14, 1970; September 14, 1971; October 16, 1972; June 12, 1973.

On August 8, 1975, the Ranch filed a petition for an arrangement under Chapter XII of the Bankruptcy Act and, one year later, was adjudicated a bankrupt.

In January of 1976, the first suit challenging the financial operations of the Calderone-Curran Ranches was filed by Charles S. Tirone in the United States District Court for the Western District of New York before United States District Judge John T. Elfvin. This action (hereinafter *Tirone*) alleges violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 growing out of the October, 1972 and June, 1973 public offerings.

On July 23, 1976, the present case (hereinafter *Roth*) was initiated. The plaintiffs here utilizing the same statutory base contend that the various defendants published misleading prospectuses in connection with the offer and sale of the investment contracts and that the defendants engaged in certain other fraudulent practices. This proceeding includes all sixteen defendants involved in the *Tirone* action, as well as three other named defendants, Ray mond Lockhart, Albert Lopatin and Touche, Ross & Company.

Fourteen of the 16 defendants common to both the *Tirone* and *Roth* cases have brought the instant motion requesting a transfer of this action to the Western District of New York pursuant to 28 U.S.C. § 1404 (a). This motion is opposed by the plaintiffs involved here and partially opposed by the three defendants who are not parties to both actions. these defendants request that, if the case is transferred, the claims against them be severed.

Title 28 U.S.C. § 1404(a) provides:
 "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."
 The threshold question in any § 1404(a) transfer is whether the action "could have been brought" originally in the transferee court. [FN2] *Hoffman v. Blaski*, 363 U.S. 335 (1960). It is generally accepted that this language requires that (1) the transferee court have subject matter jurisdiction over the action; (2) venue is proper there, and (3) service of process can be made on the defendants. See 1 *Moore's Federal Practice* P 0.145 [6], p. 1636.

> FN2 The Court notes that the plaintiffs have not challenged the fact that the New York court is one in which this action could have been brought. Nevertheless, § 1404(a) as written and as interpreted in *Hoffman v. Blaski*, 363 U.S. 335 (1960) is addressed to the *power* of a District Court to effectuate such a transfer. Thus, an analysis of the New York Court's ability to hear this case is in order in spite of the plaintiffs' acquiescence.

*2 Only two provisions in the federal securities law need be addressed to determine if the Western District of New York is a court in which this case could have been brought. This is so because § 22(a) of the 1933 act, 15 U.S.C. § 77v(a), and § 27

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2
1978 WL 1133 (E.D.Mich.), Fed. Sec. L. Rep. P 96,716
**(Cite as: 1978 WL 1133 (E.D.Mich.))**

of the 1934 act, 15 U.S.C. § 77aa, govern subject matter jurisdiction, venue, and service of process in actions under federal securities laws.

These sections specify that federal district courts have subject matter jurisdiction over violations of the 1933 and 1934 acts. Furthermore, because the alleged violations of state securities laws are derived from precisely the same facts as the federal claims, a federal court may exercise jurisdiction over the pendent state claim. *United Mine Workers* v. *Gibbs,* 383 U.S. 715 (1966).

Section 27 of the 1934 Securities Act also establishes venue for violations of that chapter:
"Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business . . ."
This section authorizes a liberal venue rule in cases under the act, allowing venue in a district where any of the alleged violations occurred.

Thirteen of the plaintiffs in the present action are New York residents who were mailed the prospectuses at issue here and who ultimately purchased the securities. There is sufficient proof that the mailing and receipt of the prospectuses was a material act constituting the alleged violations of the Securities Act of 1934. *S ee Hilgeman* v. *National Ins. Comp. of America,* 547 F.2d 298 (5th Cir. 1977); *S.E.C.* v. *National Student Marketing Corp.,* 360 F.Supp. 284 (D. D.C. 1973). Because an act constituting an alleged violation of the act occurred in New York, venue is proper in that district for all defendants under the 1934 securities law. [FN3] Wright, Miller & Cooper, *Federal Practice and Procedure,* § 3824, p. 161. Also, if venue is proper under the 1934 act, venue is established for any claims under the 1933 act. See Wright, Miller, Cooper, *supra; Johns* v. *Dahl,* 392 F.Supp. 1208 (W.D. Va. 1975); see generally *Moore's Federal Practice* P 0.140[5] p. 1392.

> FN3 The venue provision of the 1934 act specifies that suit may be brought in any *district* where a violation occurred. Defendants' motion identifies 13 plaintiffs as residents of New York, but it does not establish that any of them were residents of

the Western District of New York when the prospectuses were received. The Court has searched the records involved in this case and has been unable to determine whether any of the plaintiffs were residents of that district. Nevertheless, because the plaintiffs did not challenge the fact that this action could have been brought originally in the Western District of New York, the Court will assume that at least one of the plaintiffs was mailed a prospectus in that district.

*3 Finally, both the 1933 and 1934 securities acts authorize nation-wide service of process. 15 U.S.C. § 77v(a); 15 U.S.C. § 78aa. Therefore, the Court concludes that this action could have been brought in the Western District of New York as that term is used in 28 U.S.C. § 1404(a), and that the merits of defendants' motion to transfer may now be addressed.

Section 1404(a) provides that a court, in considering a motion to transfer, must analyze three factors-the convenience of the parties, the convenience of witnesses, and the interests of justice. In actuality, the Court is allowed to consider any factors going to the determination of relative convenience between the transferor and transferee courts. Wright, Miller & Cooper, *supra,* § 3847, p. 236. Section 1404(a) thus requires a careful balancing of competing interests which must necessarily be drawn from the facts of a particular case. *Van Dusen* v. *Barrack,* 376 U.S. 612, 622 (1964); *Starnes* v. *McGuire,* 512 F.2d 918, 925 (D.C. Cir. 1974). An analysis of the facts in the present case convinces the Court that the interests which § 1404(a) was designed to promote would be better served by transferring this case to the Western District of New York.

The crucial point in the Court's decision to transfer this action is the pendency of a related case in the Western District of New York. [FN4] There can be no doubt that the interests of justice would not be furthered by the continued separation of these similar claims. Sixteen of the nineteen defendants in this case are also named as defendants in the *Tirone* action. Like *Roth,* the *Tirone* case involves alleged violations of the 1933 and 1934 Securities Acts due to misstatements or omissions of the Calderone-Curran prospectuses.

> FN4 Section 1404(a) authorizes tranfer to a district court, but does not allow transfer to a specific judge. In deciding this motion, however, the Court is assuming that the District Court for the Western District of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1978 WL 1133 (E.D.Mich.), Fed. Sec. L. Rep. P 96,716
**(Cite as: 1978 WL 1133 (E.D.Mich.))**

New York has a rule similar to Local Rule XXIV in this Court which would guarantee that this transferred case would be assigned to Judge Elfvin.

The importance to be attached to the existence of a companion case in deciding a motion to transfer was recognized by the United States Supreme Court in *Continental Grain Co.* v. *Barge FBL-585,* 364 U.S. 19 (1960). In that case the Court stated: "To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to wastefulness of time, energy and money that § 1404(a) was designed to prevent." The maintenance of these two cases as two separate actions not only raises the possibility of duplicitous pre-trial and trial proceedings, but it also increases concern that the Courts might reach inconsistent verdicts. *See Schneider* v. *Sears,* 265 F.Supp. 257, 267 (S.D.N.Y. 1967).

The progress which the *Tirone* court has made reinforces this Court's decision to transfer the case to the Western District of New York. Judge Elfvin has already decided various motions for summary judgment and dismissal. Furthermore, the *Tirone* case has also moved into the discovery stage. [FN5] These facts suggest to the Court that the transfer to the New York Court would not only prevent duplication of effort, but would promote the interests of justice and benefit the parties involved by offering a more expeditious resolution of the case. *Fanin* v. *Jones, supra.*

> FN5 Plaintiffs argue that the amount of discovery completed in the *Tirone* case is not at all substantial and that despite the exchange of sets of interrogatories only 460 pages of depositions actually exist. Plaintiffs therefore contend that the pendency of the New York action is entitled to much less weight in a decision to transfer. The Court disagrees. It is not a question of the quantity of discovery taken in the *Tirone* case; rather it is merely a recognition that the *Tirone* case has progressed to that stage and a realization that the *Roth* case has not. *See Fanin* v. *Jones,* 229 F.2d 368 (6th Cir.), *cert. den.* 351 U.S. 938 (1956).

*4 The plaintiffs have presented several arguments contending that the action in New York does not constitute an adequate reason for transfer. Plaintiffs point out that the actions are not identical since the New York cause of action involves only two prospectuses while the present case encompasses two additional prospectuses. However, as this Court has previously recognized, [FN6] there is little substantive difference between the 1970, 1971 and 1972 prospectuses. Since the New York Court is presently considering alleged violations of federal securities laws arising out of the 1972 and 1973 public offerings, this Court is confident that no new factual complexities will be added to the New York litigation.

> FN6 *See* Memorandum Opinion and Order Granting Motion to Stay Proceedings, dated September 23, 1976, p. 2.

The plaintiffs also present several contentions addressed to the joint factors of convenience to the parties and convenience to witnesses. In support of these claims, the plaintiffs cite the following statistics: of the 69 named plaintiffs, 33 are residents or domiciliaries of Michigan, 22 are residents or domiciliaries of Georgia, 13 are from New York and one is a resident of Massachusetts. Of the nineteen *Roth* defendants, all but one of the business entities have been organized under the laws of Michigan.

These figures are relevant in considering party and witness convenience, but they are not dispositive of the motion to transfer. Although more plaintiffs are residents of Michigan than any other state, Michigan residents do not constitute a majority of the plaintiffs. Furthermore, the plaintiffs' suggestion that the defendants' Michigan backgrounds indicate that the defense of this case would be convenient for them does not merit serious consideration. [FN7] Plaintiffs intimate that this Court is convenient to the defendants, but this position ignores the fact that a denial of this motion would place a far more burdensome obligation on the defendants-the duty of litigating the same case in two different courts.

> FN7 This gratuitous gesture is not, obviously, accepted by the defendants who are seeking the transfer.

The plaintiffs also claim that their expenses in conducting a trial in New York will also be increased. They will be forced to travel to Buffalo to try the case and will incur expenses in retaining and briefing local counsel there. Undoubtedly, if the *Tirone* case does continue to trial, the presentation of testimony will be more difficult for the Michigan plaintiffs in the New York Court. [FN8] The Court recognizes that some plaintiffs may be so inconvenienced, but it must again refrain from giving

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1978 WL 1133 (E.D.Mich.), Fed. Sec. L. Rep. P 96,716
**(Cite as: 1978 WL 1133 (E.D.Mich.))**

Page 4

these considerations controlling weight. The Court must discount to some extent the claimed expense of hiring New York counsel. The *Tirone* action, like the *Roth* case, is presented as a class action. As such, the plaintiffs' counsel in New York should be prepared to represent adequately other parties. This is not meant to suggest that plaintiffs' Michigan counsel who have demonstrated a high degree of competence and industriousness have no further role to play in these proceedings. The Michigan counsel will add their expertise to the New York case and the presence in this District of counsel totally familiar with the issues presented here might greatly ease discovery and any other problems which may arise at this stage of the case.

> FN8 At the same time it would appear that the New York, Georgia and Massachusetts plaintiffs, who constitute a plurality, would not be inconvenienced and would perhaps find Detroit more inconvenient.

\*5 Finally, plaintiffs also contend that the convenience of witnesses and access to proofs are factors which should be weighed against the transfer. Given the nature of this case, the plaintiffs assert that a significant proportion of material witnesses are located in Michigan. Also, according to the plaintiffs the books and records material to this case are in the State of Michigan. The bankruptcy action involving the Calderone-Curran Ranches, which is pending in the Eastern District of Michigan, is cited as one example of the quantity of records more accessible to this Court. [FN9]

> FN9 These records would have to be submitted in the *Tirone* case, in any event.

Because of the number of Michigan plaintiffs involved in the case, it cannot be doubted that testimony of Michigan residents will be necessary. However, these witnesses have not been identified, nor is there any indication of the importance of this testimony. Cf. *S.E.C. v. First National Finance Corp.*, 392 F.Supp. 239 (N.D. Ill. 1975). If the witnesses to which the plaintiffs refer are in fact defense witnesses, plaintiffs' argument is again unconvincing. The defense witnesses, absent a transfer of this case to Buffalo, would be asked to testify both here and in Buffalo.

In summary, the unnecessary expenditure of judicial resources as well as the harm to the parties which would surely develop if these cases are conducted separately are significant factors in deciding this

motion to transfer. The Court does not intend to denigrate the plaintiffs' claims that the convenience of parties and witnesses balances against the transfer. Yet, an analysis of plaintiffs' arguments reveals that the claimed inconveniences are sometimes minimal and often speculative. When balanced against the certain inconvenience of simultaneous proceedings, the Court must conclude that a transfer should be ordered.

Having decided that the action should be transferred to the Western District of New York, the Court must next consider the motions of three defendants requesting a severance of the claims against them. These defendants, Raymond Lockhart, Albert Lopatin and Touche, Ross & Company, have asked the Court to exercise its discretion and retain the case as to them.

The Court does have the power to sever claims in a case such as this. *Wyndham Associates v. Bintliff*, 398 F.2d 614 (2nd Cir.), *cert. den.* 393 U.S. 977 (1968); *Moore's Federal Practice* P 21,05[2]. A motion to sever requires an examination of the same facts which govern a court's decision to transfer under § 1404(a)-the convenience of parties and witnesses and the interests of justice. *Mobil Oil Corp. v. W.R. Grace & Comp.*, 334 F.Supp. 117 (S.D. Tex. 1971).

Lockhart, Lopatin and Touche, Ross are not named as defendants in the *Tirone* action. Thus, all three claim that it would be an inconvenience to have the claims against them transferred to the Western District of New York. The inconvenience to Lockhart and Lopatin is exacerbated by the fact that these two are residents of the State of Michigan and might therefore find the litigation of these claims in New York especially burdensome. [FN10]

> FN10 Touche, Ross is also a resident of Michigan; however, it is a nationwide organization and has offices in Buffalo.

\*6 The Court has predicated its decision to transfer this action largely on its desire to avoid a duplication of proceedings. 2Therefore, if the claims against Lockhart, Lopatin and Touche, Ross are significantly connected with the large cause of action, the granting of a severance would contradict the Court's stated purpose of preserving judicial resources. The precise point arises since these three defendants have argued that the claims against them are tangential, if not wholly separate, to the securities law violations which constitute the primary component of the case.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1978 WL 1133 (E.D.Mich.), Fed. Sec. L. Rep. P 96,716
**(Cite as: 1978 WL 1133 (E.D.Mich.))**

The Court must therefore turn to a consideration of the connections between these defendants and the securities laws violations alleged in the Complaint against the other defendants.

The Complaint does not precisely define the roles of Lockhart and Lopatin in the alleged securities fraud. But, it does appear that there is some factual connection between the two in this case. It is alleged that Lopatin sold investment contracts through another defendant, Manley, Bennett, McDonald & Co. Raymond Lockhart was an agent of Manley, Bennett, McDonald & Co. who arranged for the sale of investment contracts. The transactions attributed to Lockhart and Lopatin individually appear, on closer inspection, to be parts of a single transaction involving a sale of ranch contracts to two of the plaintiffs in this action-Frank LaMar and Melvin Waldman. [FN11]

> FN11 It is clear from the Complaint that Lockhart dealt with Waldman and LaMar. The conclusion that Lopatin was also involved with Waldman and LaMar is based on assertions in defendant Lopatin's motion to server dated October 31, 1977. Furthermore, Lopatin has also filed two actions in state court against LaMar and Waldman seeking recovery for the sales involved here. It is also apparent that only the plaintiffs LaMar and Waldman have any claim against Lopatin and Lockhart.

The Court is hard pressed to piece together the thrust of plaintiffs' cause of action against Lockhart and Lopatin. However, after examining the facts, the Court concludes that the claims against these two are indeed similar to each other, yet distinct from the larger securities laws violations alleged. The plaintiffs' primary case involves the preparation and public issuance of certain prospectuses. The sales of investment contracts by Lockhart and Lopatin, while possibly the end result of a deceptive practice, do not directly involve the preparation of the prospectuses but apparently were resales of purchases made from the original offering.

The plaintiffs themselves have recognized that their claims against Lockhart and Lopatin are incidental to the larger cause of action. A large section of the Complaint is addressed to the involvement of "Key Defendants" in the securities laws violations case. This section includes references to many of the defendants, but it makes no mention of either Lockhart or Lopatin.

The Court, therefore, finds that the defendants Lockhart and Lopatin are not central to the larger cause of action. The Court is further convinced that the alleged activities of these two defendants which gave rise to this suit against them are distinct from those claims which make out the core of the plaintiffs' case. The issues involving Lockhart and Lopatin could, therefore, be tried in this Court without the probability of trying the entire action twice. Therefore, because the severance of defendants Lockhart and Lopatin from this case would be more convenient for the parties involved and would not be contrary to the interests of justice, the Court will grant their motion to sever.

\*7 The severance motion of Touche, Ross however stands on different grounds. Touche, Ross certified the 1973 audits of Calderone-Curran Ranches. It is alleged that these accounting statements were false and misleading and were used in the scheme to defraud. The plaintiffs also claim that Touche, Ross participated in a continuing scheme to conceal these misrepresentations.

Touche, Ross has presented several arguments suggesting to this court that the action against it can be separated from the other issues in this case. It may be true that some of the legal theories on which the plaintiffs rely in their suit against Ross (e.g., accounting malpractice) are quite different from those asserted against the other defendants; but in making a decision such as this, the Court must avoid such a mechanistic approach and must instead determine whether the claims against Touche, Ross are sufficiently distinct from the factual background of the rest of the case to allow severance.

The four prospectuses offered by the Ranches constitute the core of the plaintiffs' case. Touche, Ross was involved in the preparation of one of these prospectuses. Yet, contrary to defendants' claims, the Court cannot view the actions of Touche, Ross to be factually distinct from the other transactions alleged to have occurred in 1973. The certification of the 1973 audit by Touche, Ross cannot be considered an isolated fact in this case. On the contrary, the Court feels that the claims against Touche, Ross, including the 1973 certification as well as the more general claim of active concealment of the information, cannot be logically separated from the other securities laws violations alleged to have occurred in 1973. To sever Touche, Ross from the New York case would force this Court to examine all of the circumstances surrounding the 1973

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 6
1978 WL 1133 (E.D.Mich.), Fed. Sec. L. Rep. P 96,716
(Cite as: 1978 WL 1133 (E.D.Mich.))

prospectuses, including the financial status of the
Calderone-Curran Ranches. This would result in a
significant duplication of effort since the New York
Court will be considering these same issues. It was
just this type of duplication which the decision to
transfer was meant to avoid.

The Court will, therefore, order that the claims
against Raymond Lockhart and Albert Lopatin be
severed from the remainder of this cause of action
and that, pursuant to 28 U.S.C. § 1404(a), the
remaining issues in this case be tried in the Western
District of New York.

IT IS SO ORDERED.

### AMENDMENT TO MEMORANDUM OPINION
### AND ORDER OF DECEMBER 11, 1978

By inadvertence, the Court, in its Memorandum
Opinion and Order of December 11, 1978
transferring the cause of action to the Western
District of New York and severing the claims against
two defendants, misstated the involvement of
defendant Touche, Ross & Company in this case.

The Court's Opinion read as follows: "Touche, Ross
was involved in the preparation of one of these
prospectuses." Memorandum Opinion, p. 13. This
statement is incorrect.    Touche, Ross was not
involved in the preparation of any of the prospectuses
which are in issue in this case.

*8 The Court, in preparing this Opinion, was fully
aware of the activities of Touche, Ross which are the
subject of the litigation here.    This factual
amendment therefore does not alter the Court's
conclusion that Touche, Ross should not be severed
from the cause of action being transferred to the
Western District of New York.

IT IS SO ORDERED, December 18, 1978.

1978 WL 1133 (E.D.Mich.), Fed. Sec. L. Rep. P
96,716

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.